Larry KING, Appellant,

v.

Glenn BROOKS, Appellee,

University of Alaska, Appellee and Cross–Appellant.

No. S–2871/S–2906.

Supreme Court of Alaska.

Feb. 2, 1990.

As Amended on Denial of Rehearing April 6, 1990.

Bradley D. Owens, Jermain, Dunnagan & Owens, Anchorage, for appellant.

William Walker, Anchorage, for Glenn Brooks, appellee.

Daniel T. Quinn, Richmond & Quinn, Anchorage, for University of Alaska, appellee, and cross-appellant.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION AND ISSUES PRESENTED FOR REVIEW.

Larry King brought suit in superior court against Glenn Brooks, his supervisor, for intentional infliction of emotional distress. King's employer, the University of Alaska, was permitted to intervene. The superior court granted summary judgment in favor of Brooks and the University on the ground that Brooks' conduct towards King was not sufficiently extreme and outrageous to subject Brooks to liability on a theory of intentional infliction of emotional distress. The superior court entered final judgment dismissing the suit and awarded partial attorney's fees to Brooks, but denied any award of costs or attorney's fees to the intervening University. King appeals the liability issue, and the University cross-appeals the attorney's fees issue.

### II. FACTS.

In reviewing the grant of a motion for summary judgment we are bound to take that view of the facts which most favors the appellant, to determine "whether there

are any genuine issues of material fact, and whether the moving party is entitled to judgment as a matter of law." *Drake v. Hosley*, 713 P.2d 1203, 1205 (Alaska 1986) (citations omitted). The following summary of facts reflects that perspective.

King was employed as a sergeant by the Department of Public Safety of Anchorage Community College (ACC), a unit of the University of Alaska System, from March 1982 until January 1988, when his employment was terminated. King went on disability leave in February 1987 because of stress-induced depression and post-traumatic stress reaction disorder. King's psychiatrist attributes King's emotional and mental distress primarily to King's "harassment and psychological abuse by Glenn Brooks." King alleges that Brooks, ACC's director of public safety, intentionally inflicted emotional distress upon him from August 1983 until King filed suit in October 1985. The University of Alaska was permitted to intervene.

During King's first year and a half at ACC, the relationship between King and Brooks was unremarkable. Then, in August 1983, "Brooks began to single [King] out for harassment and abuse." [1]

Brooks, whom fellow public safety officers at ACC testified was not an easy person to get along with, thereafter made life difficult for King, apparently in an attempt to coerce King into quitting his job. In particular:

1. Brooks provided a special performance evaluation especially for King.

2. Brooks assigned King extensive overtime and additional responsibilities after King had informed Brooks of his increased child-care obligations.

3. Brooks "yelled at [King], call[ed] [him] a liar and told [him] that he did not want to hear anything [King] had to say because he did not believe [King]."

4. Brooks insisted that King be examined by a psychologist selected by Brooks and during a timetable established by Brooks although King was in the hospital at the time.

5. Brooks personally requested an intimidating state trooper to proctor King's psychological examination. During the exam, Brooks peered into the examination room approximately four times.

6. Brooks delayed three weeks in contacting King to return to work after Brooks learned that King had passed the psychological examination.

7. Brooks returned King to light duty status although King was medically fit to resume full job duties, in contradiction to past department practice.

8. Brooks reduced King's rank and salary and placed him on probationary status for six months. (King formally grieved this action, resulting in a retroactive reversal of the rank and salary reductions, but not of the probationary period.)

---

1. Although none of the parties explains why this change occurred, King's immediate supervisor (and Brooks' first-level subordinate), Lt. Robert Bachand, provided a plausible explanation in his deposition testimony:

A. When Larry first came on, he and the director, Glenn Brooks, were very, very close. There were periods of time when I was out doing a lot of work and Larry was in the office with Glenn Brooks continuously with a closed door. I had seen this happen before and I suspected what was happening. Larry had a scheme to make money, and that's the bottom line.

. . . .

A. . . . Larry and Glenn, I found out, were trying to go into business together to get a contract down at the municipality. This is at the time when the municipality was redesignat[ing] an area downtown for a service area for enforcement of parking. Instead of hav-

ing APD or meter maids doing the enforcement, they were going to have a security agency, I guess, come and do the enforcement.

Larry, I guess, is the one that really told me that they were in fact doing something in that area. That [it] had nothing to do with work, it was going to be taken care of downtown. . . .

. . . .

A. They lost the contract downtown. It was bid to somebody else. Then another little project came up, I guess security at Humana. They were going to be providing security for Humana. At that point they had a rift. It appeared that one was trying to beat the other to Humana to get the contract without the other one knowing about it. That's what I perceive to have happened. From that point on, the relationship between the two of them steadily deteriorated.

9. Brooks falsely accused King of misrepresenting his rank on an official state document and subjected King to embarrassment and humiliation by making the accusation essentially public.

10. Brooks altered and amended previous work evaluations in King's personnel file.

11. Brooks harassed and singled King out on the job, practically to an extent that King could do nothing right in Brooks' mind.

12. Brooks falsely accused King of making a false arrest and tape-recorded an interview between them concerning the incident, an unprecedented action in the department.

13. Brooks concealed from King knowledge of a potentially dangerous situation on campus.

14. Brooks again accused King of false arrest and requested a letter from the district attorney stating that King's involvement in the arrest had been illegal. (The D.A. refused and commended King for his actions.)[2]

## III. DISCUSSION.

### A. *The Exclusivity of the Workers' Compensation Remedy.*

■ Brooks asserts that the workers' compensation statutes provide King's exclusive legal remedy for his claimed injuries.[3] The superior court determined that "[a]ll of the acts and conduct complained of by King against Brooks [were] done by Brooks within the scope of his employment as King's supervisor on the job" and that "Brook's conduct was deliberate and intentional." These determinations have not been appealed.

This precise issue was addressed in *Elliott v. Brown*, 569 P.2d 1323 (Alaska 1977). There we held that workers' compensation was the exclusive remedy

against the employer, *id.* at 1325–26, but that it "should not be exclusive when an employee commits an intentional tort on a fellow worker." *Id.* at 1327. Because "[t]he socially beneficial purpose of the workmen's compensation law would not be furthered by allowing a person who commits an intentional tort to use the compensation law as a shield against liability," *id.*, the court held that the plaintiff-employee could maintain a common-law action against a fellow employee who had assaulted him. *Id.* at 1325, 1327. We further held, contrary to the general rule in other states, that an employee need not elect either the common-law or the statutory remedy. *Id.* at 1327.

We are not persuaded that Brooks and the University have made a compelling argument to overrule or distinguish *Elliott.* The fact that in the instant case Brooks may not ultimately pay any damages because of the likelihood of receiving indemnification from the University is purely fortuitous.[4]

### B. *Res Judicata and Exhaustion of Administrative Remedies.*

■ Brooks argues that administrative remedies existed to remedy King's grievances, that to the extent King utilized the administrative grievance process his claim is barred by res judicata, and that to the extent King did not utilize administrative remedies his claim is barred by the exhaustion of administrative remedies doctrine. We agree with King that the doctrines of res judicata and administrative exhaustion are not applicable in the instant case because King's suit is against Brooks, not against the University. The only way King can collect damages from Brooks is by instituting and maintaining a civil suit against him. Review of the applicable ad-

---

2. These assertions, for the most part, are based on King's 18-page affidavit, which the superior court relied on in dismissing the case.

3. *See* AS 23.30.020, 23.30.055.

4. Brooks' reliance on *Cole v. Fair Oaks Fire Protection District*, 43 Cal.3d 148, 233 Cal.Rptr. 308, 729 P.2d 743 (1987), is unpersuasive. We do not equate employee-employer suits with those by an employee against his or her employer in this context.

ministrative grievance procedures demonstrates that they are not intended to resolve, or to provide a remedy for, claims such as that advanced here by King against Brooks for intentional infliction of emotional distress.

### C. *Whether the Record Justified the Superior Court's Grant of Summary Judgment.*

In ruling on Brooks' motion for summary judgment the superior court stated in part:

> Accepting all of King's allegations against Brooks as true, this Court concludes that Brooks's conduct against King does not rise to the level of being "outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." This court concludes that reasonable fact-finders would not differ as to whether Brooks' conduct was sufficiently extreme and outrageous as to subject him to liability for the emotional distress suffered by King.

■ Viewing the evidence and reasonable inferences therefrom in the light most favorable to King, we conclude that the superior court erred in granting summary judgment in favor of Brooks. In our view, a reasonable fact finder might conclude from King's opposition to the summary judgment motion that Brooks' conduct was sufficiently extreme and outrageous to impose liability upon him under a claim of intentional infliction of emotional distress (hereinafter IIED).

We first addressed the tort of IIED in *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454 (Alaska 1985):

> The Restatement (Second) of Torts, § 46(1) (1965) establishes the elements of a claim of intentional infliction of emotional distress. The offending party, through extreme or outrageous conduct, must intentionally or recklessly cause severe emotional distress or bodily harm to another. We hold that the trial judge should make a threshold determination whether the severity of the emotional distress and the conduct of the offending party warrant a claim of intentional infliction of emotional distress. *The actor's conduct must be very similar to that which would sustain a claim for punitive damages.* The judge's threshold determination on these issues will not be overturned absent an abuse of discretion.

*Id.* at 456 (footnotes omitted; emphasis added). In *Richardson* we upheld the superior court's determination that the plaintiffs' emotional distress was not sufficiently severe to warrant a claim for IIED. *Id.* at 456–47.

In *Tommy's Elbow Room, Inc. v. Kavorkian,* 727 P.2d 1038 (Alaska 1986), we held that the superior court had abused its discretion in giving an IIED instruction where the conduct was the bar's allegedly reckless sale of alcohol to an intoxicated person. *Id.* at 1043–44. In so ruling we said: "While the law appears to be moving toward imposing liability for this tort, recovery thus far has been limited to the most extreme and outrageous cases of violent attack, where fright or shock is especially likely." *Id.* at 1043 (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 12, at 66 (5th ed. 1984) (hereinafter *Prosser and Keeton* )).[5]

Following *Richardson* and *Kavorkian,* in *Teamsters Local 959 v. Wells,* 749 P.2d

---

**5.** We further quoted the Restatement (Second) of Torts (hereinafter Restatement) § 46 comment d (1965):

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement § 46 comment d, *quoted in Tommy's Elbow Room, Inc.,* 727 P.2d at 1043–44.

349 (Alaska 1988),[6] we upheld the superior court's determination that "making a threat to take someone's life is, as a matter of law, outrageous conduct which is sufficient basis on which to find and award for severe emotional distress." *Id.* at 358. In *Wells* we also explicitly set forth four elements of a cause of action for IIED: "(1) the conduct is extreme and outrageous, (2) the conduct is intentional or reckless, (3) the conduct causes emotional stress, and (4) the distress is severe." *Id.* at 357. Only the first element is at issue in this appeal.

In *Richardson* we ruled that the court is to make a threshold determination with regard to outrageousness, subject to an abuse of discretion standard. 705 P.2d at 456.[7] King argues that the Restatement guidelines for extreme or outrageous conduct are ambiguous and suggests that this court adopt the punitive damages threshold test articulated in *Alyeska Pipeline Service Co. v. O'Kelley*, 645 P.2d 767 (Alaska 1982), and hold that "acts done with malice, or bad motives, or reckless indifference to the interest of another" are compensable. *Id.* at 774.[8] We need not address this contention since in our view application of either test to the record before us leads to

the conclusion that the superior court incorrectly resolved this threshold issue.

Our review of the evidence demonstrates that for purposes of summary judgment King showed that Brooks unjustifiably pursued a two year private vendetta which caused King substantial emotional distress. King had received uniformly superior job evaluations from his own supervisor, Lt. Bachand, throughout the period in question, and other fellow officers testified as to King's competence and Brooks' mistreatment of King. Given the foregoing, and the averments by Brooks relating to his alteration and amendment of King's personnel file, and Brooks' false accusations that King had made false arrests, we hold that the superior court erred in its threshold determination that Brooks' conduct, as a matter of law, could not constitute outrageous conduct.[9] In our view a trier of the fact could reach different conclusions as to whether Brooks' conduct could be reasonably regarded as sufficiently outrageous to permit recovery for intentional infliction of emotional distress.

The superior court's grant of summary judgment in favor of Brooks is RE-VERSED and the matter REMANDED to the superior court for further proceedings

6. In *Croft v. Wicker*, 737 P.2d 789 (Alaska 1987), we upheld an IIED instruction where the defendant's "alleged conduct was the intentional sexual abuse of a minor child while a guest at her parents' home, with full knowledge that they were in close proximity of the incident." *Id.* at 793.

In *Mattingly v. Sheldon Jackson College*, 743 P.2d 356 (Alaska 1987), we upheld the superior court's dismissal of an IIED claim. *Id.* at 364. The superior court had failed to find the "intentional, reckless, extreme, outrageous, or malicious conduct" required to sustain a IIED or punitive damages claim. *Id.* The conduct was the excavating and bracing by the college's employees of a trench which subsequently collapsed on the plaintiff's employees. *Id.* at 358.

7. This ruling is consistent with Restatement § 46 comment h:

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so. *Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in*

*the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.*
(Emphasis added.)

8. Whether the flexibility of the Restatement standard is good or bad is a debatable point. *Compare* Gibelver, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct*, 82 Colum.L.Rev. 42, 43 (1982) (the seeming indeterminacy of the outrageousness standard "has facilitated [the tort's] development by freeing courts of the necessity of rationalizing results in terms of rules of universal applicability") *with* Austin, *Employer Abuse, Worker Resistance, and the Tort of Intentional Infliction of Emotional Distress*, 41 Stan.L. Rev. 1, 7 (1988) (legal analysis lacks sufficient specificity and concreteness to attack problem of employer abuse of employees).

9. We will reverse a ruling for abuse of discretion only when left with a definite and firm conviction in reviewing the whole record, that the trial court erred in its ruling. *Betz v. Chena Hot Springs*, 742 P.2d 1346, 1348 (Alaska 1987).

not inconsistent with this opinion.[10]

---

10. Our holding makes it unnecessary to address the University's cross-appeal regarding attorney's fees.

In regard to the main appeal we have considered the remaining contentions of Brooks and the University and conclude they are without merit.