Harold A. **CAMERON**, Sharon McLeod, William B. McMullen, and Caroline Venusti, individually and as employees of the State of Alaska; and the State of Alaska, Appellants,

v.

Burle B. **BEARD**, Appellee.

No. S–5152.

Supreme Court of Alaska.

Dec. 3, 1993.

Rehearing Denied Jan. 18, 1994.

---

Randy M. Olsen, Asst. Atty. Gen., Fairbanks, and Charles E. Cole, Atty. Gen., Juneau, for appellants.

Thomas R. Wickwire, Fairbanks, for appellee.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MOORE, Chief Justice.

### I. *Introduction*

In this appeal, the State and four individual defendant supervisors challenge the jury's verdict in favor of Burle Beard, a former Department of Transportation employee, on his claims of constructive discharge and intentional infliction of emotional distress (IIED).

The State maintains that the superior court erred in interpreting this court's decision in *Beard v. Baum*, 796 P.2d 1344 (Alaska 1990), as conclusively establishing that Beard was excused from exhausting the administrative remedies provided under his collective bargaining agreement. The State also asserts that Beard's constructive discharge claim was barred by an earlier workers' compensation Compromise and Release. In the alternative, the State argues that the superior court erred in denying its motion for directed verdict/judgment n.o.v. on the constructive discharge claim.

The individual defendants argue that the court erred in denying their motions for directed verdict/judgment n.o.v. on the IIED claims. Alternatively, they argue that the court erred in denying their motion for summary judgment on the ground that they were immune from suit as officials of the state. Finally, both the State and the individual defendants appeal the court's denial of their motions for a new trial and remittitur.

### II. *Facts and Proceedings*

Except for a one-year interruption due to injury, Burle Beard worked for the state Department of Transportation (DOT) from 1966 until he retired in 1986. After 1975, Beard worked in DOT's Right of Way section in Fairbanks. In all of Beard's job performance evaluations from 1966 to 1985, his performance was rated as either acceptable, high acceptable or outstanding.

In April 1985 Beard became the Alaska Public Employees Association (APEA) building representative. Believing that some of his supervisors and co-workers were violating DOT personnel rules, Beard began an informal investigation into departmental abuses. Beard looked for evidence to back up his suspicions that DOT personnel routinely falsified time sheets and leave slips and misused state time and property. He reported his findings to a number of state and federal agencies.

In June 1985, Caroline Venusti, the DOT personnel director, learned of Beard's allegations from a labor relations expert in the Department of Administration. Venusti met with Beard the same day. Venusti also arranged a meeting between Beard

and William McMullen, the DOT regional director. At this meeting, Beard outlined his allegations to McMullen, and McMullen told Beard that he was going to appoint an investigator to review the situation. McMullen then asked DOT's Internal Review Section to investigate Beard's claims.

Beard claims that once his allegations of misconduct became known, his supervisors began a purposeful campaign to force him off the job. The day following his meeting with McMullen, an unidentified APEA member asked for a new election for building representative. Beard was subsequently voted out of the position. Later that month, Sharon McLeod, a Right of Way supervisor, completed Beard's annual job performance evaluation and rated his performance as "low-acceptable." She noted that Beard spent too much time attending to unassigned and non-job related tasks and improperly copied the time sheets of another employee. McLeod also observed that the Federal Highway Administration had not rescinded its refusal to accept Beard's appraisals. McLeod's evaluation indicated that Beard would be re-evaluated quarterly and suggested strictly controlling his work assignments to ensure that he followed his supervisor's instructions. Beard grieved this evaluation.

In August, McMullen met with Beard and gave him a copy of Internal Review's final report concerning Beard's allegations of departmental abuses. The report concluded that only two of the twenty-one allegations which Beard had made were substantiated. Beard expressed his dissatisfaction with these findings and went public with his allegations.

A month later, Beard met with McMullen, Venusti and APEA representatives to discuss Beard's continuing campaign to have his allegations investigated by non-DOT personnel. At the close of the meeting, Beard agreed only to discuss his allegations with those individuals or agencies

which he had previously contacted. However he told McMullen that he would still send a letter concerning his charges to the Fairbanks District Attorney because he had already drafted it.

McMullen later discovered that Beard had a DOT secretary type this letter. When confronted with this discovery, Beard initially lied to McMullen and told him that his girlfriend had typed the letter. McMullen suspended Beard for thirty days for lying about the incident. Beard grieved this suspension, and it was subsequently reduced to seven days through a settlement between the APEA and the State. Beard received three weeks back pay as a result of the settlement.

In October McLeod performed a quarterly evaluation of Beard and rated his performance as "low-acceptable." McLeod based her negative evaluation on Beard's suspension, his failure to follow directions when doing appraisals and his need to develop a "teamwork job attitude." However she also noted that Beard had fulfilled some of the goals set out in his previous evaluation. She no longer required Beard to fill out hourly time sheets but suggested that he be re-evaluated in three months. Beard grieved this evaluation.

In February 1986 Stephen Sisk, who temporarily replaced McMullen as acting regional director, gave Beard a written warning that he would face severe disciplinary action unless he stopped harassing his co-workers with his continuing allegations of departmental corruption.[1] Beard grieved the warning memo and requested copies of the underlying complaints.

Also in February, the Division of Personnel concluded its grievance review of McLeod's July evaluation of Beard. It ordered DOT to have Beard's evaluation redone by Richard Kendall, Beard's supervisor in Engineering, because McLeod had only been Beard's supervisor for 16 days of the annual evaluation period. Kendall com-

---

1. The basis for this warning was a series of remarks Beard made during an after work gathering at a local bar. Beard told several DOT employees that he had successfully grieved his 30 day suspension. He also expressed his hope that his rebuttals to McLeod's evaluations would be placed in her personnel file. McMullen learned of these remarks and requested memos from three employees detailing these comments.

pleted the evaluation in March and rated Beard's performance as acceptable in all categories. Both McLeod and McMullen added critical comments to the evaluation.

In March McLeod completed her third evaluation of Beard and rated his job performance as "acceptable" but rated his interpersonal relationships with co-workers as "unacceptable." McLeod cited continued disruptive behavior by Beard, referring to the February warning letter and new employee complaints.[2] Beard again grieved the evaluation.

McMullen issued Beard a final warning about "disruptive behavior" in May. The warning cited a memo by visiting DOT director, Milt Lentz, which stated that Beard had initiated a discussion of the office situation with Lentz and had told him that he planned to sue the state and buy a sailboat with the settlement. Also in May, McLeod required Beard to supply a doctor's certificate to justify his use of sick leave. This was the first time Beard had ever been asked to provide such a certificate.

Beard resigned from DOT in August 1986. According to Beard, his current supervisor, Jerry Apple, told him that McMullen was in the process of preparing a termination letter and suggested that Beard take action to protect himself. Beard immediately wrote out his resignation and submitted it the next day. Following Beard's retirement, Apple completed a final evaluation of Beard which again critically rated his performance.

Beard filed a workers' compensation claim several days after his resignation. The basis for his claim was "persistent mental stress with acute and chronic back and neck pain" caused by "continuous on-the-job harassment."

While this workers' compensation claim was pending, Beard filed a complaint against McMullen, alleging misrepresentation, defamation and IIED. McMullen moved to dismiss the IIED count on the ground that Beard had not exhausted his administrative remedies under the collective bargaining agreement. In May 1987, the superior court granted McMullen's motion and struck this count after Beard failed to file a timely opposition. Beard filed an opposition one day later which included an affidavit from Beard's union representative, stating that he had told Beard that his supervisors' attempt to "harass him by using work assignments, apportioning the workload and otherwise structuring his work environment so as to make it as uncomfortable as possible" was not a grievable matter.

A lengthy exchange of motions between the parties ensued. Ultimately, the court permitted Beard to add Cameron, McLeod, Venusti, and the State as defendants. In his amended complaint, Beard also added claims for, *inter alia,* constructive discharge and denial of freedom of speech. The court, however, rejected the constructive discharge and IIED claims, concluding that Beard failed to exhaust his administrative remedies.

Beard appealed to this court on this issue and others. *See Beard v. Baum,* 796 P.2d 1344 (Alaska 1990) (*Beard I*). In July 1990, while this first appeal was pending, Beard endorsed a Compromise and Release (C & R) of his workers' compensation claim and received $13,000 in settlement. A month later, this court issued *Beard I.* We reversed the superior court's dismissal of Beard's constructive discharge and IIED claims and remanded the case for further proceedings. *Id.* at 1348–50, 1353–54.

On remand, the individual defendants moved for summary judgment, arguing that Beard had failed to make out prima facie IIED claims against them. In the alternative, they contended that their status as state officials shielded them from liability under *Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150 (Alaska 1987). The State also moved for summary judgment on Beard's constructive discharge claim, asserting that Beard had failed to establish

---

**2.** McLeod cites six employee complaints of "disruption" in the March evaluation. These memos, including one by McLeod herself, briefly recount various comments made by Beard about his successful grievance settlement.

a prima facie case. It also argued that the July 1990 C & R had settled all past, present, or future claims for compensation between the State and Beard arising out of his claims of harassment and forced retirement. Finally the State argued that Beard's constructive discharge claim was barred because he had failed to exhaust his administrative remedies under the collective bargaining agreement.[3]

Judge Hodges denied all these summary judgment motions, stating generally that "there are factual issues to be resolved." However, the court did agree to hear argument on the exhaustion of administrative remedies issue if Beard ultimately prevailed at trial.

At trial Beard testified at length about the activities of his supervisors after his allegations of corruption became public. Beard identified McMullen as the driving force of the effort to force him off the job. He testified that after he rejected the Internal Review report as a "whitewash," McMullen told him that "this is going to look awful bad on anyone's evaluation who proceeds any further than this or brings this up in any way." According to Beard, McMullen then manipulated him into lying about who typed his letter to the Fairbanks District Attorney. He also testified that McMullen told him when he returned to work after this suspension that he would never be promoted "in a thousand years."

Beard further contended that his supervisors began collecting evidence of departmental "disruption" in early 1986 in order to create a pretext for firing him. Beard contended that McMullen solicited memos from DOT employees concerning his comments about the office situation and his grievance settlement and used these memos as the basis for the February 1986 warning letter. He also speculated that the handwritten draft of the final May warning letter circulated in March between McMullen, Venusti and a labor relations expert in the Department of Administration indicates that they were planning to engineer further "disruptive incidents" which would eventually lead to his termination. Beard suggests that the Lentz memo was the product of such a plan.[4]

Both McMullen and Venusti admitted at trial that they solicited memos from various employees concerning Beard. Venusti characterized this activity as "preparing a case against an employee" but denied that it constituted keeping a "secret file" on Beard in violation of DOT personnel rules and the APEA contract.[5] According to Venusti, she resisted Beard's efforts to see these memos in order to protect the confidentiality of the other employees. Both she and McMullen declined to comment on the Division of Personnel's subsequent determination that the evidence of disruption underlying the evaluations and warnings was mostly unfounded.[6]

Sharon McLeod, Beard's supervisor during most of the relevant period, testified

---

**3.** The State based this motion on the February 1991 deposition of Beard's union representative, Bruce Senkow, in which Senkow allegedly contradicts his earlier affidavit.

**4.** According to Beard, Milt Lentz completely misrepresented this conversation with Beard. Beard claims that after a "closed-door" meeting with Cameron and McLeod, Lentz approached his desk and immediately asked him about the office situation. Beard denied telling Lentz he planned to sue the state. He also testified that Lentz told him that "the people here, the supervisors here are getting a little bit worried about the situation because someone might actually investigate it. Well just be real careful that someone doesn't come up behind you and blow you away."

**5.** The APEA contract expressly states that the keeping of a secret file on an employee is prohibited and requires the contents of a supervisor's performance logs to be shared with employees on a regular basis.

**6.** In October 1986 the Division of Personnel completed its review of the February 1986 Sisk warning memo and recommended that all references to the memo and the underlying complaints be removed from Beard's file. In January 1987 a Division of Personnel investigator recommended removing the paragraph citing Beard's disruptive behavior from McLeod's March 1986 evaluation on the grounds (1) that it was based on the Sisk warning and (2) that the other complaints were inconclusive. He also recommended the deletion of comments indicating that Beard had a negative effect on the productivity of the section.

that her critical assessments of Beard's job performance were the product of her own observations and complaints voiced by other DOT employees. She testified that she did not discuss her evaluations or her management techniques with either Venusti or Cameron. Harold Cameron, the chief Right of Way agent at the Fairbanks office, testified that he did not take an active role in the evaluation process.

The testimony of Richard Kendall, Beard's supervisor in Engineering, corroborates Beard's story of a prolonged effort to force him off the job. According to Kendall, McMullen called him into his office in January 1986 and told him to write a statement indicating that Beard's activities were disrupting the Engineering section. Kendall testified that despite his unwillingness to comply, McMullen insisted that he write the statement before leaving McMullen's office. After he was directed to redo Beard's July 1985 evaluation, Kendall testified that McMullen met with him four or five times and pressured him to write a negative evaluation of Beard. Kendall testified that, at one of these meetings, McMullen placed Beard's uncompleted evaluation form and Kendall's pending grievance for supervisor pay side-by-side on a desk, indirectly suggesting that his grievance would be affected if he did not write a negative evaluation. Kendall provided the following account of one meeting:

> [McMullen] was pretty intimidating towards me. He would pound his fist on the desk and, you know, stare at me for long periods of time without saying anything. And then he would get up and walk around the room, you know, and look at his plaques on the wall and go stare out the window with his hands behind his back and kind of rock back and forth on his heels, and then ask me what I was going to say in my evaluation again. And all I could say was, you know, "I've already told you I'm going to give him a favorable evaluation." And he said that's not what he wanted to see and that—well, he said something about my ability to supervise and that if I did a good evaluation that he was going to see just how good a supervisor I was by

> coming over to my office unannounced and go through my files, go through my notes, go through my calculations. And he said, "We'll just see what kind of supervisor you are." It was kind of a threat I thought.
>
> . . . .
>
> ... [H]e made it very clear ... things weren't going to go very smoothly for me. If I gave Burle a good evaluation, then that meant that everything I did from that point on was going to be scrutinized and there would be possible disciplinary action against me.

According to Kendall, McMullen told him that "Burle's ass is going down the road."

Kendall further testified that, in response to his complaints about McMullen's pressure tactics, another DOT supervisor, Jerry Apple, told him that Cameron had asked him to do a "hatchet job" on Beard.

At the close of Beard's case in chief, the State moved for a directed verdict on Beard's claims against the State and the individual defendants, again arguing that Beard had failed to present sufficient evidence. Judge Hodges denied this motion. The jury returned a verdict in favor of Beard, awarding him $696,571 in lost wages and benefits for the breach of his employment contract. McMullen, Venusti and Cameron were each assessed $1,000 in compensatory damages for IIED (no compensatory damages were assessed against McLeod). The jury awarded no compensatory damages on Beard's first amendment claim, commenting that money could not compensate Beard for the loss of his freedom of speech. The jury also awarded Beard punitive damages as follows: McMullen—$70,000; Venusti—$45,000; Cameron—$45,000; McLeod—$1,000.

The State subsequently moved for judgment n.o.v., for a new trial and for remittitur. Judge Hodges also denied each of these motions. The court also ruled that this court's decision in *Beard I* rendered the exhaustion of remedies issue res judicata.

## III. *Discussion*

### A. *Exhaustion of Administrative Remedies*

 We have repeatedly held that "an employee must first exhaust his contractual or administrative remedies, or show that he was excused from doing so, before he may pursue a direct judicial action against his employer." *Casey v. City of Fairbanks*, 670 P.2d 1133, 1136 (Alaska 1983), *quoted in Beard I*, 796 P.2d at 1348. In *Beard I*, we reversed the superior court's decision to strike Beard's constructive discharge and IIED claims because Beard had presented evidence suggesting that his union representative had refused to grieve these matters.[7] *Beard I*, 796 P.2d at 1349.

 The superior court erroneously interpreted our decision in *Beard I* as conclusively deciding the exhaustion issue. Our decision merely reversed the court's ruling in favor of the State and did not constitute a final determination that Beard was excused from pursuing his remedies under the collective bargaining agreement. *See, e.g., Pedersen–Szafran v. Baily*, 837 P.2d 124, 126–28 (Alaska 1992).[8] Beard never sought summary judgment on this issue

and the State never had an opportunity to rebut the evidence presented in Beard's opposition. The doctrine of res judicata does not apply when one party has not had an opportunity to litigate an issue. *See Ferguson v. State Dep't of Corrections*, 816 P.2d 134, 138 (Alaska 1991). We therefore remand this issue to the superior court for an evidentiary hearing.

### B. *Compromise and Release*

 The State contends that the July 1990 workers' compensation C & R bars Beard's constructive discharge claim and that Judge Hodges thus erred in denying the State's motion for summary judgment.[9] When reviewing the denial of a motion for summary judgment, we determine whether there are genuine issues of material fact and whether the moving party deserves judgment as a matter of law. *Criterion Ins. Co. v. Velthauser*, 751 P.2d 1, 2 (Alaska 1986).

 A release is interpreted in the same manner as any other contract. *Schmidt v. Lashley*, 627 P.2d 201, 204 n. 7 (Alaska 1981). In the case at bar, the plain language of the C & R signed by Beard

---

7. The State's original motion to dismiss on the pleadings actually functioned as a motion for summary judgment because it incorporated a number of exhibits outside the pleadings. *See* Alaska R.Civ.P. 12(c).

8. In *Pedersen*, an employee filed an original action against the State alleging breach of her employment contract. Her complaint included a statement that she had exhausted the administrative remedies provided in the applicable collective bargaining agreement. *Id.* at 126. The State moved to dismiss the action for failure to establish subject matter jurisdiction on the ground that the employee could only appeal the administrative decision to the superior court. Although the employee filed an affidavit in opposition, stating that she had pursued administrative remedies but that a grievance procedure had not been afforded to her, the superior court dismissed her case. We reversed, holding that the employee's affidavit was sufficient to withstand the State's motion to dismiss. *Id.*

On remand, the employee filed an amended complaint which conceded that she had been afforded an administrative hearing. The State then obtained summary judgment on the exhaustion issue. *Id.* at 126–27. On appeal, we

upheld the superior court's grant of summary judgment on the ground that our previous decision did not conclusively determine the employee's right to bring an independent action. *See id.* at 128.

9. The State also argues that Beard's exclusive remedy against the State for injury and lost wages is under the Workers' Compensation Act. This argument is unpersuasive. The purpose of the Workers' Compensation Act is to compensate a victim of work-related injuries for the future economic losses which the worker will suffer as a result of the injury. *Wien Air Alaska v. Arant*, 592 P.2d 352, 357 (Alaska 1979), *overruled on other grounds by Fairbanks North Star Borough Sch. Dist. v. Crider*, 736 P.2d 770, 775 (Alaska 1987). In his constructive discharge action, Beard seeks to recover the wages and benefits lost due to the breach of his employment contract. *See also Pichon v. Pacific Gas & Elec. Co.*, 212 Cal.App.3d 488, 260 Cal.Rptr. 677 (Cal.App.1989) (holding that the exclusivity provisions of California's workers' compensation act bar an employee from raising a civil claim for "an 'injury' arising within the course and scope of employment," not a claim for "[e]conomic contract damages incurred independent of any disability").

consistently limits its scope to Beard's rights under the Workers' Compensation Act.[10] Only two sentences even arguably read like a general release of all claims:

> By execution of this release the employee acknowledges his intent to release the employer and its workers' compensation insurance carrier from any and all liability arising out of or in any way connected with the work-related injury referred to above and any known or as yet undiscovered disabilities, injuries or other damages associated with said injury. This Compromise and Release shall be effective in discharging the employer and its workers' compensation carrier of all liability of whatsoever nature for all past, present and future workers' compensation benefits relating to the above-referenced injury.

The California Court of Appeals recently rejected a broad interpretation of a similar workers' compensation release. *See Pichon v. Pacific Gas & Elec. Co.*, 212 Cal. App.3d 488, 260 Cal.Rptr. 677, 686 (1989). In *Pichon,* a discharged employee brought suit against his former employer, alleging, *inter alia,* breach of express and implied contract of employment and IIED. A year after he was terminated, he filed a workers' compensation claim for injuries to his "psyche, heart, [and] nervous system" resulting from harassment in the workplace. The workers' compensation board approved a release of his claim for $42,000. *Id.* 260 Cal.Rptr. at 680. The release stated:

> [S]aid employee releases and forever discharges said employer and insurance carrier from all claims and causes of action, whether now known or ascertained, or which may hereafter arise or develop as a result of said injury.

*Id.* 260 Cal.Rptr. at 686. A typewritten addendum to the printed form included a dismissal with prejudice of the employee's retaliatory discharge and misconduct claims arising under the California Labor Code. *Id.*

The trial court granted summary judgment in favor of the employer finding that the release barred the employee's claims. *See id.* 260 Cal.Rptr. at 680. The California Court of Appeals reversed:

> We conclude that it was ... error to hold that, as a matter of law, the release of any and "all claims and causes of action ... as a result of said injury" included [the employee's] claims for wrongful termination which survived summary adjudication. By its terms, the release was directed to claims that arose as a result of the injury described in the release, i.e., the physical and mental injuries [the employee] suffered as a result of harassment on the job and the termination of his · employment. We have concluded that the only claims which survived summary adjudication and [the employee's] waiver of any non-economic damages, are limited to economic damages not caused by injuries to [the employee's] psyche. We have also concluded that [the employee] would not be entitled to recover any lost wages for any period of time that he was disabled. Thus, the remaining claims cannot be described as claims arising as a result of any compensable injuries to [the employee's] psyche. At the least, there is an issue of fact as to whether the parties intended the release to cover the type of claims [the employee] is now asserting.

*Id.* 260 Cal.Rptr. at 687.

We agree with the reasoning of the California Court of Appeals and conclude that Judge Hodges was correct in denying the State's motion for summary judgment.[11]

---

**10.** *Cf. Martech Constr. Co. v. Odgen Envtl. Servs., Inc.,* 852 P.2d 1146 (Alaska 1993). In *Martech,* we interpreted the scope of a general release very broadly to include all claims related to the disputed transaction and upheld the trial court's grant of summary judgment based on the release. In reaching this decision, we focused on the broad language repeatedly used throughout the release and concluded that all claims arising out of the disputed transaction, not explicitly reserved, were settled as a matter of law. *Id.* at 1152.

**11.** The State is incorrect in its claim that Beard must show that the release should be set aside in order to avoid summary judgment on this issue. We have previously held that the party relying on the release must show that the release "was given with an understanding of the nature of the instrument." *Witt v. Watkins,* 579

We emphasize that an employee is not entitled to recover lost wages in a breach of contract action for any period of time that the employee was disabled and received compensation benefits for the disability. *See Pichon,* 260 Cal.Rptr. at 687.

## C. *Constructive Discharge*

The State contends that, as a matter of law, there is insufficient evidence in the record to support the jury's verdict on Beard's constructive discharge claim.[12] In *Beard I,* we recognized a cause of action for constructive discharge:

> [W]here an employer makes working conditions so intolerable that the employee is forced into an involuntary resignation, the employer is as liable for any illegal conduct involved therein as if it had formally discharged the employee.

796 P.2d at 1350; *see also Klondike Indus. Corp. v. Gibson,* 741 P.2d 1161, 1166 n. 5 (Alaska 1987). As we observed in *Beard I,* "Beard's claim is that by creating conditions so intolerable as to force him to resign, the state violated its duty under Article 5(c) of the [collective bargaining agreement] to discharge him only for just cause." [13] 796 P.2d at 1350.

■ To establish constructive discharge, an employee has the burden of showing that a reasonable person in the employee's position would have felt compelled to resign. *See, e.g., Christie v. San Miguel County Sch. Dist.,* 759 P.2d 779, 783 (Colo. App.1989); *Reihmann v. Foerstner,* 375 N.W.2d 677, 683–84 (Iowa 1985); *see also*

*Huyen v. Driscoll,* 479 N.W.2d 76, 81 (Minn.App.1991). However the employee need not prove that the employer acted with the specific intent of causing the employee to resign. *Hammond v. Katy Indep. Sch. Dist.,* 821 S.W.2d 174, 177 (Tex. App.1991); *Slack v. Kanawha County Hous. & Redev. Auth.,* 188 W.Va. 144, 423 S.E.2d 547, 558 (1992).

■ Courts have generally held that criticism of job performance or other management decisions do not, standing alone, create intolerable working conditions. *See Huyen,* 479 N.W.2d at 81 (holding that criticism of job performance is insufficient to establish intolerable working conditions); *Reihmann,* 375 N.W.2d at 683–84 (holding that a reasonable person would not feel compelled to resign merely because his employer decided to relocate his office in a neighboring town). However, a number of courts have upheld constructive discharge judgments where an employer pursues a sustained campaign against an employee. *See Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 743 S.W.2d 380, 382–85 (1988) (upholding constructive discharge judgment where a corporate employer engaged in a continuous campaign to force an employee to resign over an 18 month period after the employee reported pricing violations to a governmental agency); *see also Ford v. Alfaro,* 785 F.2d 835, 841–42 (9th Cir.1986) (holding that an employee presented a prima facie claim of constructive discharge where the employer accused the employee of conspiring to file a complaint

P.2d 1065, 1069 (Alaska 1978); *see also Schmidt,* 627 P.2d at 204. Only then does the burden shift to the releasor to "show by clear and convincing evidence that the release should be set aside." *Witt,* 579 P.2d at 1070.

**12.** We will reverse a trial court's denial of a motion for judgment n.o.v. only when the evidence, viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment. *City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 220 (Alaska 1978).

**13.** This cause of action should be distinguished from the public policy exception to the employment-at-will doctrine. *See Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 743 S.W.2d 380, 382–85 (1988) (discussing the policy concerns courts

have relied on in creating an exception to the general rule that an employee at will may be discharged without good cause). While most jurisdictions which have recognized such a cause of action have defined it as a tort, a small minority have defined it as a breach of an implied contractual duty not to discharge an employee for an act done in the public interest. *Compare Gantt v. Sentry Ins.,* 1 Cal. 4th 1083, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992) (recognizing tort cause of action) *and Wagner v. City of Globe,* 150 Ariz. 82, 722 P.2d 250 (1986) *with Sterling,* 743 S.W.2d at 385 (recognizing exclusive contract approach) *and Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834, 841 (1983).

with the U.S. Department of Labor; the employer told her he would "get even" and that he did not want her to work for him any longer).

Taking the evidence presented at trial in the light most favorable to Beard, the record indicates that (1) an unidentified person requested a building representative election shortly after Beard began making allegations at DOT and that this election ultimately led to Beard being voted out of office as union representative; (2) Beard's job performance evaluations following his investigation were consistently negative although his previous evaluations had been positive; (3) many of the alleged incidents forming the basis of these negative evaluations were later disproved or explained by an independent review panel; (4) McMullen told Beard that "he would never be promoted in 1,000 years;" (5) McMullen solicited memos from other DOT workers concerning Beard's comments about the office situation and his grievance settlement and then exaggerated the substance of these memos in the February 1986 warning letter; (6) McMullen pressured Kendall to write a negative evaluation of Beard in March 1986; (7) Cameron asked one of Beard's supervisors, Jerry Apple, to "do a hatchet job" on Beard; (8) Venusti kept a "secret file" of memos concerning Beard's alleged disruptive behavior in violation of DOT personnel rules and the APEA contract and resisted Beard's efforts to discover the nature and source of these memos; (9) Milt Lentz solicited Beard's opinion of the office situation and then wrote a memo falsely stating that Beard had spontaneously told him of his plans to sue the state; and (10) one of Beard's supervisors told Beard that a termination letter was being prepared and that he should "do something quick" before he was fired.

Although recognizing that some of Beard's allegations are pure speculation, we conclude that there is sufficient evidence in the record to support the jury verdict on this issue. *See Sterling,* 743 S.W.2d at 385. This is particularly true in light of Beard's testimony that a DOT supervisor told him that he was about to be fired and suggested that he take immediate action. *Cf. Sheets v. Knight,* 308 Or. 220, 779 P.2d 1000, 1005 & n. 5 (1989) (holding that where an employer tells an employee to resign or be fired, a court can find the resignation to be a constructive discharge).

### D. *Intentional Infliction of Emotional Distress*

To state a cause of action for IIED, a plaintiff must establish (1) that the defendant's conduct was extreme and outrageous, (2) that the conduct was intentional or reckless, (3) that this conduct caused the plaintiff emotional distress, and (4) that the distress was severe. *Teamsters Local 959 v. Wells,* 749 P.2d 349, 357 (Alaska 1988). The individual defendants contend that there is insufficient evidence to support the jury's IIED verdicts as a matter of law.

We have adopted the definition of extreme and outrageous conduct set forth in the Restatement (Second) of Torts. *Beard I,* 796 P.2d at 1350.

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id.* (quoting *Oaksmith v. Brusich,* 774 P.2d 191, 200 (Alaska 1989)).

Because the jury found for Beard on this issue, we will again review the record in the light most favorable to him. *City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 220 (Alaska 1978). Nonetheless, whether Beard introduced sufficient evidence to support a prima facie IIED claim against each of the defendants is a threshold question to which we apply an abuse of discretion standard. *King v. Brooks,* 788 P.2d 707, 711 (Alaska 1990); *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 456 (Alaska 1985).

#### (1) *McMullen*

McMullen contends that his activities do not constitute "outrageous conduct"

as a matter of law. We disagree. In our view, a reasonable juror could conclude that McMullen's threats, coupled with his behind the scenes efforts to collect evidence of disruptive activity by Beard, is sufficiently outrageous to permit recovery for IIED.

In *King v. Brooks*, 788 P.2d 707 (Alaska 1990), we held that an employee stated a prima facie IIED claim against his supervisor where the supervisor had pursued a "two-year private vendetta" against the employee, causing him substantial emotional distress.[14] *Id.* at 711. Similarly the Arkansas Supreme Court has upheld an IIED judgment against a supervising city director who engaged in a two-year campaign to force an employee police officer off the job. *Hess v. Treece*, 286 Ark. 434, 693 S.W.2d 792 (1985), *cert. denied*, 475 U.S. 1036, 106 S.Ct. 1245, 89 L.Ed.2d 354 (1986).[15]

McMullen's other arguments are equally unpersuasive. There is ample evidence in the record that McMullen's activities caused Beard serious emotional distress. We therefore uphold the jury's IIED verdict against McMullen.

#### (2) *Venusti*

■ For the same reasons, we uphold the IIED verdict against Venusti. The record indicates that Venusti was present at several of McMullen's meetings with Kendall. She actively solicited memos from a number of employees concerning Beard's comments about his allegations and grievance settlement which were used to bolster the formal warnings issued Beard. She also resisted Beard's efforts to discover the substance of these complaints of "disruption" despite the fact that the APEA contract required such complaints to be shared directly with the employee on a regular basis. Based on this evidence, a reasonable juror could conclude that Venusti worked with McMullen to create a paper trail designed to culminate in Beard's termination, thereby causing Beard serious emotional distress.

#### (3) *Cameron*

■ Our review of the record discloses that the evidence against Cameron is merely speculative and circumstantial. Nothing of substance connects Cameron to the activities of McMullen and Venusti or to a plot to drive Beard from his job.[16] *Cf. Reihmann*, 375 N.W.2d at 681 (where

14. In *King*, the record revealed that King's supervisor (1) created a special performance evaluation for King; (2) assigned King extensive overtime and additional responsibilities; (3) yelled at King and called him a liar; (4) insisted that King undergo a psychological examination in intimidating circumstances; (5) delayed King's return to work after he passed the psychological evaluation; (6) kept King on light duty status contrary to departmental practice; (7) reduced King's rank and status and placed him on probationary review for six months; (8) publicly and falsely accused King of misrepresenting his rank causing King embarrassment and humiliation; (9) altered and amended King's past work evaluations; (10) harassed King and singled him out for negative comments; (11) wrongly accused King of making a false arrest and tape recorded an interview concerning the incident; (12) concealed from King a potentially dangerous situation on campus; and (13) accused King a second time of false arrest and then sought a letter from the district attorney stating that King's involvement had been illegal. *Id.* at 708–09. On the basis of these facts, we reversed the trial court's grant of summary judgment in favor of the supervisor. *Id.* at 711.

15. In *Hess*, the city director (1) made numerous unfounded complaints regarding the officer's performance, (2) conducted surveillance of the officer's activities, and (3) communicated his threats to fire the officer via a number of different sources. *Id.* 693 S.W.2d at 794–95.

16. At trial, Beard testified that Cameron's approval of McLeod's evaluations established that he was part of the plot against him. Beard further suggested that Cameron was aware of and implicitly condoned the misuse of State time and property which Beard sought to have investigated. Finally he speculated that Cameron and McMullen collaborated with Milt Lentz to create the "disruptive incident" which formed the basis of the May final warning. None of this speculation is corroborated. The only evidence even remotely suggesting that Cameron took any action against Beard is Kendall's testimony that Cameron asked another DOT supervisor to do a "hatchet job" on Beard. This evidence is insufficient to establish intentional infliction of emotional distress as a matter of law.

court refused to infer that two defendants had conspired together to force plaintiff's relocation and expel him from the business because no evidence connected the actions of each of the defendants beyond their close business and personal ties). We therefore conclude that the superior court abused its discretion in denying the motion for judgment n.o.v. as to Cameron.

### (4) *McLeod*

We also conclude that the evidence fails to support an IIED verdict against McLeod. At trial Beard contended that McLeod's negative evaluations and harassment tactics (e.g., hourly time sheets, quarterly evaluations, limited and controlled work assignments, or the request for a doctor's verification for sick leave) were intended to make his job intolerable and to prevent further investigatory activities. We conclude that McLeod's conduct does not reach the threshold level of outrageousness. As the Illinois Court of Appeals has observed:

> Personality conflicts, questioning of job performance and job transfers, whether for disciplinary or management purposes, are unavoidable aspects of employment. Frequently, they produce concern and distress for the affected employee. Yet, if the distress from such incidents was deemed so severe that no reasonable person could be expected to endure it, nearly all employees would have a cause of action for intentional infliction of emotional distress.

*Heying v. Simonaitis*, 126 Ill.App.3d 157, 81 Ill.Dec. 335, 342, 466 N.E.2d 1137, 1144 (1984); *see also Owens v. Second Baptist Church of La Grange*, 163 Ill.App.3d 442, 114 Ill.Dec. 557, 562, 516 N.E.2d 712, 717 (1987) (holding that the fact that a defendant has authority over the plaintiff does not lessen the plaintiff's burden of showing the outrageous nature of the employer's conduct). McLeod, unlike McMullen and Venusti, did nothing more than what her job required her to do—supervise and evaluate Beard's performance. Her conduct, regardless of her motive, is simply insufficient to sustain an IIED verdict. *See Reihmann*, 375 N.W.2d at 681 (suggesting that the relevant inquiry is not whether a defendant was motivated by an improper purpose but rather whether the methods adopted shock the conscience).

### E. *Official Immunity*

The individual defendants also argue that Judge Hodges erred in denying their motions for summary judgment based on official immunity under *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150 (Alaska 1987). Their position is without merit. Under *Aspen*, the individual supervisors have qualified immunity, which shields officials from liability only when their acts are "done in good faith and are not malicious or corrupt." *Id.* at 158. Whether Beard's supervisors acted in good faith is a question of fact which precludes resolution of the issue on summary judgment.[17]

### F. *Damages Issues*
#### (1) *The IIED awards* [18]

The individual defendants contend that the verdicts against them and the corresponding punitive damage awards establish that the jury's deliberations were tainted by passion and prejudice.[19] Alternatively, the individual defendants contend that the punitive damage awards are excessive and should be reduced to less than a 3 to 1 ratio of punitive to compensatory damages. The essence of the defendants' arguments is that the jury verdicts are "manifestly unfair" because the evidence of IIED against each individual defendant is so slight and

---

**17.** The individual supervisors dropped this issue after the court denied its summary judgment motion and did not seek to present the immunity issue to the jury. Therefore they have waived any further resolution of this issue. *See Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991).

**18.** Because we reverse the IIED judgments against Cameron and McLeod, we only address here the propriety of the awards against McMullen and Venusti.

**19.** The State contends that the jury was inflamed by Beard's comments concerning his stress caused by the litigation process but offers nothing to back up this contention.

the ratio between the compensatory and punitive awards is so great.

██ This court has refused to prescribe a definite ratio between compensatory and punitive damages. *Ben Lomond, Inc. v. Campbell,* 691 P.2d 1042, 1048 (Alaska 1984). Though comparing punitive and actual damage awards is one way to determine if punitive damages are excessive, other factors, such as the magnitude and flagrancy of the offense, the importance of the policy violated, and the defendant's wealth, are equally important to the determination. *Clary Ins. Agency v. Doyle,* 620 P.2d 194, 205 (Alaska 1980)

We will disturb the trial court's denial of a motion for a new trial or remittitur only for abuse of discretion. *Id.* at 204. Here the jury's award was appropriate in light of the individual defendants' conduct. We therefore affirm the IIED awards against McMullen and Venusti.

### (2) The constructive discharge award

The State contends that Judge Hodges erred in refusing to grant remittitur on the constructive discharge judgment against it. The State offers no authority for its position that the judgment was excessive, merely asserting that a more appropriate judgment would limit the award to the wages/benefits Beard would have earned from the time of his resignation until 1991 when the State presumes he would have retired at age 55. On the record presented, we conclude that Judge Hodges did not abuse his discretion in denying the State's motion.

### IV. Conclusion

To summarize, we conclude that there is sufficient evidence supporting the jury's constructive discharge judgment against the State and affirm the superior court's denial of the State's motion for judgment n.o.v. We also affirm the court's determination that the workers' compensation release does not bar Beard's constructive discharge claim. However, because the superior court erroneously interpreted our decision in *Beard I* as conclusively deciding that Beard's failure to exhaust his administrative remedies was excused, we remand for an evidentiary hearing on this issue. If the trial judge ultimately finds that Beard failed to exhaust his administrative remedies, the constructive discharge judgment naturally would be voided.

We affirm the jury's IIED judgments against McMullen and Venusti but reverse the IIED judgments against Cameron and McLeod. We also conclude that the superior court properly denied the individual defendants' motions for summary judgment based on official immunity. Finally we affirm the superior court's denial of the motions for new trial and remittitur.

AFFIRMED in part, REVERSED in part, and REMANDED.

COMPTON, J., dissents in part.

COMPTON, Justice, dissenting in part.

I dissent because the issue of exhaustion of contract remedies should not be remanded for an evidentiary hearing. This issue was resolved in the prior appeal. Thus there is no basis for remanding the issue for redetermination.

The court states:

> The superior court erroneously interpreted our decision in *Beard I* as conclusively deciding the exhaustion issue. Our decision merely reversed the court's ruling in favor of the State and did not constitute a final determination that Beard was excused from pursuing his remedies under the collective bargaining agreement.

Op. at 545. Although the court suggests that we were reviewing a Civil Rule 12(b) motion to dismiss in *Beard I,* we did not so limit our discussion of the issue:

> Beard *is excused* from grieving his constructive discharge and intentional infliction of emotional distress claims under the CBA because Senkow, his union representative, refused to file a grievance for Beard's allegations of harassment underlying those claims on Beard's behalf.

> . . . .

... Beard could not comply with the grievance procedures established by the CBA because his union representative refused to represent him. Any such attempt would have been futile. Under these circumstances, *we hold that Beard is excused from exhausting his remedies* under the CBA for his claims of constructive discharge and intentional infliction of emotional distress.

Since the superior court *erred in concluding that Beard was not excused from exhausting his contractual remedies* as to each of these claims, we must reverse the superior court's decision striking the claims unless they are not legally viable.

*Beard v. Baum*, 796 P.2d 1344, 1349 (Alaska 1990) (emphasis added). We then concluded that the claim for constructive discharge was legally viable. *Id.* at 1350. As to the claim of IIED, we noted that "[s]ince Beard has presented evidence of harassment and of emotional distress, his claim for intentional infliction of emotional distress may be legally viable.... On remand, the court should evaluate this evidence to determine whether it is sufficient to support Beard's claim." *Id.* We did not similarly instruct the superior court to determine whether Beard was excused from exhausting his contractual remedies.

It is not surprising that the superior court read *Beard I* as settling the question of whether Beard was excused from exhausting his contractual remedies. We did not "merely reverse" the superior court's decision and remand for further proceedings. We unqualifiedly and unconditionally held that Beard was excused from exhausting his contractual remedies.

Bruce Senkow was the former APEA Field Representative whose affidavit was used by Beard in opposition to the State's mistitled Motion to Dismiss. In that affidavit, Senkow stated in essence that he had refused to grieve Beard's claims because they were not grievable under the contract. The State did not present any evidence to rebut that statement, or explain that it might have been incorrect or inaccurate as far as certain claims were concerned.

Following our decision in *Beard I*, the State deposed Senkow. In its view Senkow's deposition showed that he would have filed a grievance had Beard asked, but Beard had not. Thus Senkow's earlier affidavit was either incorrect or inaccurate as to certain claims. Based on that deposition, the State concluded that this court had misconceived a material fact. The State promptly filed a belated Petition for Rehearing, as well as a Motion for Late Filing of Petition for Rehearing. We granted the motion, but ultimately denied the petition.

The State's petition was directed solely at the issue of exhaustion of contractual remedies. The State asserted that the issue of futility had not been raised below: "There had been no scrutiny of the facts of Beard's relationship with his union representative at the trial level before appeal." nor had it been raised on appeal: "However, the [supreme] court also found, *sua sponte*, that Beard was excused from grieving his dispute on the grounds that Beard's union representative, Senkow, refused to represent Beard." The State asked this court to "rehear its decision on the futility of Beard's exercise of his contractual remedies." We declined to do so.

If the State was correct, this court should have granted the State's petition for rehearing and afforded appropriate relief at that time. And it should now admit its error. However, the remedy is not now to grant in effect the long ago and far away petition for rehearing. Such a resolution begs disappointed litigants to continue the fray in the hope that at some point in the future they will prevail, even though the issue has long since been decided. Further, it erodes the confidence trial courts should have in effectuating decisions of this court. If our decision and resolution of the petition for rehearing were correct, as I believe it was, there is no justification for remanding this issue for redetermination.

Regarding the procedural issue, the State argues that it never had an opportunity to rebut the evidence presented in

Beard's opposition. Op. at 545. I disagree. The court notes that the State's motion to dismiss was actually a motion for summary judgment. Op. at 545 n. 8. The State acknowledges that "there were opportunities for the state to defend the dismissal, both at reconsideration and on appeal, ..." The State's only argument is that it did not have the benefit of discovery or factual determinations. However, the State brought the motion to dismiss for failure to exhaust, yet failed to respond to Beard's evidence that he was excused from exhaustion.

*Pederson–Szafran v. Baily,* 837 P.2d 124 (Alaska 1992), is not controlling. In *Pederson* the court noted that the decision in *Szafran v. State,* Mem.Op. & J. No. 452 (Alaska, May 10, 1989), was based only on Szafran's affidavit that she was not afforded grievance rights. *Pederson,* 837 P.2d at 126. The court stated only that " '[t]he superior court therefore erred in dismissing the complaint for lack of subject matter jurisdiction.' " *Id.* (quoting *Szafran,* Mem. Op. & J. No. 452). Following remand, Szafran filed an amended complaint conceding that she had received an administrative hearing. *Id.* at 128. "[G]iven Szafran's concession in her amended complaint that a grievance procedure was in fact afforded her, ... we conclude that the superior court's grant of summary judgment to the State was not inconsistent with *Szafran I.*" *Id.*

In this case the new evidence presented by the State is a deposition by Senkow, which may contradict his earlier affidavit. However, differences in context preclude such a conclusion on this record. This is not a situation in which the grievant has recanted or changed his or her position. Certainly Beard has not.

Furthermore, as a practical matter it seems useless to remand the issue of exhaustion of contract remedies to the superior court. The court will be asked to determine if an administrative appeal to Beard's supervisors would have been futile. These are the same supervisors whom the jury already has found to have engaged in "outrageous" behavior justifying the IIED claim and punitive damages. The answer seems obvious.