OPINION
 

 BRYNER, Justice.
 

 I. INTRODUCTION
 

 Jack Finch appeals the superior court's order granting summary judgment in favor of Bob's Distributing, his former employer, on claims of constructive discharge, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress. Because Finch presented sufficient evidence to create a genuine fact dispute as to whether Bob's constructively discharged him and breached the covenant of good faith and fair dealing, we reverse the superior court on those issues. But because Finch failed to present a prima facie case of intentional infliction of emotional distress, we affirm summary judgment on that issue.
 

 II. FACTS AND PROCEEDINGS
 

 In 1983 Jack Finch began working as a driver in the Fairbanks branch of Bob's Distributing (Bob's).
 
 [1]
 
 For ten years, Finch worked many hours of uncompensated overtime and participated in a pension plan. In 1993, when his concerns about unpaid overtime and pension plan payments went unaddressed by Bob's, Finch filed suit in superior court. His amended complaint alleged that Bob's violated the Alaska Wage and Hour Act (AWHA),
 
 [2]
 
 breached the covenant of good faith and fair dealing, mishandled his ac
 
 *1284
 
 counting/pension plans, and violated the Fair Labor Standards Act (FLSA).
 
 [3]
 
 The parties settled all state law claims in a court-supervised settlement on April 22, 1994. In exchange for Finch releasing his claims and agreeing to receive authorization before working future overtime, Bob's paid Finch $120,000. - Superior Court Judge Ralph Beistline confirmed the settlement on January 26, 1995.
 

 According to Finch, after the April 24, 1994, settlement, Bob's subsequently engaged in a pattern of harassment and retaliation designed to force his resignation; this campaign made his working conditions intolerable, caused his health to deteriorate, and led him to resign in July 1995.
 

 In October 1998 Finch sued Bob's in superior court alleging breach of the covenant of good faith and fair dealing, retaliation and constructive discharge, and intentional infliction of emotional harm (IIED). Bob's moved for summary judgment. - Superior Court Judge Charles R. Pengilly granted Bob's motion, concluding, as to Finch's claims for constructive discharge and breach of the covenant of good faith and fair dealing, that
 

 nothing in the record indicates the existence of any "sustained campaign" by Bob's to do anything but maximize its profits. Its position in the ongoing dispute about overtime reflected nothing more than an effort, which was only partially successful, to enforce its rights under the 1994 settlement agreement.... Bob's is therefore entitled to summary judgment....
 

 The court further determined that Finch failed to establish a triable IIED claim, because the conduct alleged in support of this claim was neither outrageous nor extreme. Finch moved for reconsideration; the court denied Finch's motion. Finch appeals.
 

 III, DISCUSSION
 

 A. Standard of Review
 

 We review a grant of summary judgment de novo and affirm only if there are no genuine issues of material fact and the non-moving party is entitled to judgment as a matter of law.
 
 [4]
 
 We draw all reasonable inferences in favor of the non-moving party.
 
 [5]
 

 B. Genuine Issues of Material Fact Exist in Determining Whether Bob's Constructively Discharged Finch and Breached the Covenant of Good Faith and Fair Dealing.
 

 The superior court granted Bob's motion for summary judgment on Finch's claims of constructive discharge and breach of the covenant of good faith and fair dealing on two separate grounds: (1) Finch presented insufficient evidence to support these claims, and (2) Bob's established that it was only attempting to enforce the rights it secured under the settlement agreement by reducing Finch's overtime. On appeal, Finch maintains that summary judgment was improper as to these claims, because he presented genuine issues of material fact as to whether Bob's engaged in a pattern of conduct amounting to a constructive discharge and whether Bob's actions were authorized under the settlement agreement.
 

 1. Finch presented sufficient evidence of constructive discharge to overcome summary judgment.
 

 Finch complained that Bob's forced him to resign by creating intolerable working conditions and making Finch the target of a "sustained campaign of harassment and discrimination ... [that] included threats to fire [Finch], ridicule of [Finch]," and route assignments that set unattainable and impossible standards. Finch argued that the "net effect of the changes undertaken by Bob's Distributing after the bringing of my superi- or court complaint in this matter was a demotion of me through route reassignments and changes in my compensation format."
 

 Bob's responded to these instances of alleged harassment by asserting that the changes it made were for legitimate business
 
 *1285
 
 purposes, mainly to decrease overtime liability, and were not part of a "sustained campaign to harass, penalize, and embarrass [Finch]. They were normal types of business decisions." In addition, Bob's maintained that these actions are not so intolerable as to cause a reasonable person to quit.
 

 We defined constructive discharge in the related cases of Beard v. Boum (Beard I)
 
 [6]
 
 and Cameron v. Beard (Beard II).
 
 [7]
 
 Beard was a State Department of Transportation (DOT) employee who claimed that his supervisors "engaged in a pattern of harassment tactics to force him to resign" after he made public allegations of corruption at the DOT.
 
 [8]
 
 After Beard reported that various DOT employees were misusing state time and property and falsifying their time sheets, he claimed that several of the accused supervisors retaliated against him. They allegedly organized a campaign to vote him out as building representative of the Alaska Public Employees Association, unfairly evaluated his work as "low acceptable," gave him busy-work assignments, scrutinized details of his performance, and falsely accused him of stealing a typewriter.
 
 [9]
 
 Beard suffered neck and back pain due to this work-related stress; on the advice of his doctor, as well as a friendly supervisor, Beard resigned.
 
 [10]
 

 The superior court struck Beard's claim for constructive discharge. We reversed, holding that Beard had a legally viable claim for constructive discharge: "where an employer makes working conditions so intolerable that the employee is forced into an involuntary resignation, the employer is as liable for any illegal conduct involved therein as if it had formally discharged the employee."
 
 [11]
 
 After this ruling, the case was tried to a jury that granted a verdict in favor of Beard. The state and four of Beard's supervisors appealed.
 

 We considered this appeal in Beard II. In upholding the jury verdict, we elaborated on the elements required to establish a claim of constructive discharge. We observed that "Iclourts have generally held that criticism of job performance or other management decisions do not, standing alone, create intolerable working conditions. However, a number of courts have upheld constructive discharge judgments where an employer pursues a sustained campaign against an employee."
 
 [12]
 
 We elected to define a viable constructive discharge claim, by reference to an objective standard: "an employee has the burden of showing that a reasonable person in the employee's position would have felt compelled to resign. However[,] the employee need not prove that the employer acted with the specific intent of causing the employee to resign."
 
 [13]
 
 Applying this standard, we concluded that, even though some of Beard's allegations were pure speculation, the record contained sufficient evidence to support the jury verdict.
 
 [14]
 

 Under the Beard II standard, Finch was required to offer evidence that might lead a reasonable person to find the working conditions created at Bob's so intolerable as to cause a reasonable person to resign. Viewing the summary judgment record in the light most favorable to Finch, we conclude that he met this requirement.
 

 
 *1286
 
 In response to Bob's motion for summary judgment, Finch specified four incidents to support his assertion that Bob's had engaged in a sustained harassment campaign. First, Finch presented evidence indicating that in November 1994, he requested emergency leave to attend to his dying father in Texas. After waiting a week and receiving no response, Finch took two weeks of leave. After Finch returned, his sales manager, Randy Main, sent him a letter asserting that this was the third year in a row that Finch had a " 'family emergency' arise around the Thanksgiving holiday season." Main demanded that Finch provide him with a complete explanation of the cireumstances surrounding his leave.
 

 Second, Finch claimed that in January 1995 Bob's gave his lucrative distribution route to a junior employee, Roel Revermann, forcing Finch to take Revermann's less prof'itable route and to perform other "menial chores" under Revermann's supervision. Finch stated that he had worked hard to develop his customer base in Fairbanks for more than ten years and had continually enjoyed a good rapport with his customers. From Finch's point of view, the route switch with a junior driver was a humiliating demotion.
 

 Third, Finch asserted that, shortly after imposing the route switch, Bob's implement-éd a commission-based pay system, reducing his monthly income by forty percent-more than $1,000 per month. Although Bob's claimed that it implemented this commission-based pay system on a company-wide basis, Finch contended that Bob's delayed implementing the system in Fairbanks until it had forced him to accept Revermann's lower-volume accounts. Finch also pointed out that he was the only Bob's employee statewide to . receive a pay decrease as a result of the commission-based pay system.
 

 Fourth, Finch alleged that after placing him on a commission-pay basis, Bob's failed to support his customer service efforts. As an example of this failure, Finch testified that Bob's had erroneously advised him that a certain customer-requested special-order bread was no longer available from a supplier, when it was in fact available. According to Finch, he contacted the supplier and discovered that the specialty bread had always been available.
 

 To be sure, Bob's offered strong evidence controverting Finch's version of each of these events. But for purposes of determining whether Finch raised material fact disputes that could withstand summary judgment, we must consider the evidence in the light most favorable to Finch, not Bob's.
 
 [15]
 
 And although any one of these events alone would not support a claim for constructive discharge, when viewed in totality and in the light most favorable to Finch, we conclude that they could lead a reasonable person in Finch's position to conclude that Bob's had pursued a sustained campaign of harassment that ultimately compelled him to resign. Therefore, Finch presented sufficient evidence of constructive discharge to withstand summary judgment under the Beard II standard.
 

 2. Finch presented sufficient evidence to overcome summary judgment on his claim for breach of the covenant of good faith and fair dealing.
 

 - Given our decision that Finch raised a genuine fact dispute on his constructive discharge claim, it follows that he presented sufficient evidence to overcome summary judgment on his breach of covenant claim. For if Bob's wrongfully discharged Finch, it may have also breached the implied covenant of good faith and fair dealing.
 

 The covenant of good faith and fair dealing "does not lend itself to precise definition, but it requires at a minimum that an employer not impair the right of an employee to receive the benefits of the employment agreement."
 
 [16]
 
 In Ramsey v. City of Sand Point, we explained that the implied covenant consists of both subjective and objective factors.
 
 [17]
 
 We determined that "[aln employ
 
 *1287
 
 er engages in subjective bad faith when it discharges an employee for the purpose of depriving him or her of one of the benefits of the contract."
 
 [18]
 
 The employer breaches the objective prong if its actions stem from improper motives and it fails to "act in a manner which a reasonable person would regard as fair."
 
 [19]
 

 Finch claimed that Bob's
 

 knew the impact [the route change and commission-based pay system] would have on [him] because the switch of routes came after Bob's Distributing had announced on October 18, 1994, that a switch to commission compensation was to take effect in the spring of 1995. Adding insult to injury was Bob's Distributing's refusal to later supply the necessary product to new customers, making it impossible for [him] to acquire and service new customers to increase [his] income.
 

 Finch believed that this demotion, pay cut, and resistance to his customer service efforts were motivated by Bob's desire to retaliate for his successful overtime claim. Bob's denied these claims, asserting that it never intended to retaliate against Finch; it merely sought to curb Finch's overtime hours and decrease its employment costs.
 

 But just as Finch's evidence would permit an inference that Bob's engaged in a pattern of conduct amounting to a constructive discharge, it also would permit an inference that Bob's actions were motivated by a desire to retaliate against Finch for his successful overtime suit. Bob's action would thus have breached the subjective prong of the covenant. Further, if Bob's actions were found to be objectively unfair, they would have breached the objective prong of the covenant. Accordingly, a genuine factual dispute exists on Finch's breach-of-covenant claim.
 

 3. Material issues of fact exist as to whether Bob's actions against Finch were authorized under the settlement agreement.
 

 In granting summary judgment, the superior court also relied on the alternative basis that Bob's actions against Finch were appropriate because the record demonstrated that Bob's had merely attempted to enforce the overtime conditions of its settlement agreement with Finch. As part of the April 1994 settlement, Finch agreed not to work any further overtime without advance approval from Bob's; under the terms of the agreement, if Finch failed to comply with this provision, Bob's was entitled to terminate his employment.
 

 In moving for summary judgment, Bob's produced evidence that, after entering into this agreement in April 1994, Finch continued to work unauthorized overtime through November 1994. Finch did not controvert or dispute this evidence. But he did offer proof of a potentially valid explanation for failing to comply with the agreement's authorization requirement.
 

 It appears undisputed in the récord that Bob's did not attempt to enforce the settlement's overtime authorization requirement from April 1994-the date the parties agreed to the settlement-through October 1994. Bob's deferred implementing the authorization requirement during this period because the settlement agreement was still awaiting confirmation by the superior court in Finch's original overtime action, where the parties were disputing the agreement's enforceabilty. Thus, any unauthorized overtime worked by Finch from April through October would not have entitled Bob's to take action against him for breaching the agreement. Indeed, Bob's summary judgment motion did not assert any breach occurring before November 1994.
 

 But on October 18, 1994, Stanley Thomson, Bob's president, wrote Finch a letter stating that Bob's intended to enforce the overtime provisions of the settlement agreement beginning November 1, 1994. Bob's summary judgment motion asserted that Finch breach ed the agreement after receiving Thomson's letter, by working unauthorized overtime on
 
 *1288
 
 November 2, 4, 7, 9, and 11; in addition, Bob's asserted that Finch exceeded the amount of overtime that Bob's had authorized him to work on November 14. Finch did not deny these assertions. But he filed an affidavit explaining that he had not obtained authorization to work overtime in early November because Bob's had failed to make its preauthorization procedures clear:
 

 The 10/18/94 [Stanley Thomson letter] instructions on overtime authorization were extremely confusing to me, so I called Mr. Main and asked for clarification. My attorney, Rene Broker, also requested clarification. I then received Mr. Main's memo dated November 11, 1994. ... At the time I received the November 11, 1994, memo, I had been kept waiting 3 weeks for clarification. Once I received the November 11, 1994 memo, I began calling for permission to work overtime, as it instructed. Had the apparent draft clarification been timely provided in October, Mr. Main's later memorandum of 11/17/94 would have been unnecessary. - That memorandum criticizes me for not seeking pre-authorization during a time when I was awaiting clarification of the course I was to follow.
 
 [20]
 

 This explanation finds support in a letter that Randy Main wrote to Finch on November 11; Main's letter stated, in relevant part: "[Bob's has] received no requests for overtime this week and assume{[s] you understand the correct procedures from our earlier letter. One thought came to my mind, however, as to just how the fax approvals are to be obtained." Main's letter then detailed how to obtain faxed authorizations and how to submit them with Finch's time sheet. Viewed in the light most favorable to Finch, Main's letter could reasonably be read to imply Main's acknowledgment that Bob's overtime policies had caused some confusion and that they required clarification.
 

 Bob's only assertion below regarding the period after November 11 was that Finch exceeded the amount of overtime that Bob's had authorized on November 14. The record does not establish when Finch received Main's November 11 letter or whether he was aware of the procedures described in the letter when he worked unauthorized overtime on November 11 and 14. It is certainly not clear from the record that Finch had received the letter by then. Thus, a reasonable person might conclude that he did not work any unauthorized overtime after receiving Main's letter of clarification.
 

 When viewed in the light most favorable to Finch, then, the foregoing evidence might allow a reasonable person to find that Finch had reasonable explanations for failing to obtain authorization to work overtime through November 14. Accordingly, we find that Finch raised a genuine fact dispute as to the superior court's alternative basis for granting summary judgment-that Bob's was entitled to take adverse action against Finch for his breach of the settlement agreement.
 

 C. Finch Failed to Make Out a Viable TIED Claim.
 

 -To state a viable claim of intentional infliction of emotional distress (IIED), Finch was required to allege facts tending to show that Bob's conduct (1) was extreme and outrageous, (2) was intentional or reckless, and (3) caused Finch severe emotional distress.
 
 [21]
 

 In Richardson v. Fairbanks North Star Borough, we held that the first and third elements of this tort-outrageous conduct and serious injury-must be addressed by the trial court in the first instance:
 

 [Thhe trial judge should make a threshold determination whether the severity of the
 
 *1289
 
 emotional distress and the conduct of the offending party warrant a claim of intentional infliction of emotional distress.... The judge's threshold determination on these issues will not be overturned absent an abuse of discretion.
 
 [22]
 

 Here, although the totality of the evidence in the summary judgment record could reasonably support Finch's constructive discharge and breach of good faith covenant claims, the evidence fails to meet the applicable definition of extreme and outrageous conduct:
 

 It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
 

 The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.
 
 [23]
 

 Since the record in this case reveals no more than "insults, indignities, threats, annoyances, [and] petty oppressions,"
 
 [24]
 
 we affirm the trial court's order granting summary judgment in favor of Bob's on the IIED claim.
 

 D. The Modified Settlement Agreement Does Not Mandate Dismissal of Finch's Claims.
 

 Bob's separately argues that, even if the superior court erred on the merits, we should affirm its decision, because the court could have granted summary judgment based on the release clause contained in the settlement agreement. This clause released Bob's from "all claims set forth in [Finch's] complaint and amended complaint arising from his employment relationship with [Bob's] to date."
 
 [25]
 
 Bob's asserts that this language applies to Finch's current claims, because the superior court did not formally confirm the parties' April 1994 settlement agreement until January 1995-after Bob's alleged pattern of retaliatory harassment had already begun.
 

 We find no merit to this argument. Initially, we note that Finch's complaint in this case does not assert any "claims set forth" in his earlier "complaint and amended complaint." Moreover, under Section Nine of the settlement agreement, "[Bob's] agree[d] not to take any job action because of [Finch's] filing of the above-referenced [overtime] claims." Assuming-as we must for summary judgment purposes-that Finch's current allegations of retaliatory motivation are true, then Bob's conduct plainly violated the settlement agreement. Bob's fails to explain why it should be entitled to invoke one provision of the settlement agreement to bar an action arising from its own alleged breach of another provision. And finally, because the settlement agreement is a form of contract, the parties' intent at the time they entered the agreement controls the meaning
 
 *1290
 
 of its terms.
 
 [26]
 
 The agreement's release of all claims "to date" is therefore best understood as a reference to the date when the parties executed the agreement (April 1994), not to the date when the superior court confirmed it (January 1995). It is inconsequential, then, that Finch's current claims partly arose before confirmation,. For all these reasons, Finch's claims are not barred by the release clause of the settlement agreement.
 

 E. Res Judicata Does Not Bar Finch's Claims.
 

 Bob's lastly argues that even if the settlement does not bar Finch's claims, res judicata does.
 

 Under the doctrine of res judicata, a final judgment bars a subsequent suit, between the same parties or their privies, upon the same claim or demand. A final judgment extinguishes all claims "with respect to all or any part of the transaction, or series of connected transactions" out of which the previous action arose.
 
 [27]
 

 Bob's posits that this doctrine applies here because Finch's current claims arise out of the same employment relationship as his earlier claims, and conceivably could have been asserted in his earlier action. Bob's analogizes this case to Plumber v. University of Alaska Anchorage.
 
 [28]
 
 There we applied res judicata to bar an employee from proceeding with her wrongful discharge claim. Plumber sued the university and three administrators in federal district court on August 4, 1993, alleging racial and sexual discrimination.
 
 [29]
 
 Plumber added a retaliation claim in her amended complaint after receiving a poor work evaluation on August 23.
 
 [30]
 
 On October 18 Plumber released her racial and sexual discrimination claims against the university and administrators in exchange for a lump sum payment.
 
 [31]
 
 The court entered an amended final judgment on November 8.
 
 [32]
 

 When Plumber failed to receive a cost-of-living increase on January 2, 1994, she sent a grievance to the university governance office.
 
 [33]
 
 The university maintained that, since Plumber réceived a less than satisfactory rating on her August evaluation, she was ineligible for the increase.
 
 [34]
 

 We determined that Plumber's claim was barred by res judicata because the university regulations were in place throughout the period in question, and Plumber had received an opportunity to litigate her poor evaluation in the first suit.
 
 [35]
 

 But in contrast to Plumber's case, Finch's second suit was based on wrongs that were allegedly committed after his first suit had settled, and that, for this reason, could not have been asserted in the earlier action. Accordingly, we hold that Finch's claim is not barred by res judicata.
 

 IV. CONCLUSION
 

 We conclude that Finch presented evidence sufficient to avoid summary judgment on his wrongful discharge and breach of the implied covenant of good faith and fair dealing claims. Thus, we REVERSE the order granting summary judgment.
 
 [36]
 
 But because Finch did not make out a claim for intentional infliction of emotional distress, we AFFIRM the order granting summary judgment on that claim to Bob's.
 

 [1]
 

 . Greatland Foods, Inc. acquired the assets of Bob's Distributing in 1996. Since Finch worked for the company until 1995, we will refer to the appellee as "Bob's."
 

 [2]
 

 . AS 23.10.050-150. Specifically, Finch complained of violations of AS 23.10.060 and AS 23.10.100.
 

 [3]
 

 . 29 U.S.C. §§ 201-19.
 

 [4]
 

 . See Holland v. Union Oil Co. of California; 993 P.2d 1026, 1029 (Alaska 1999).
 

 [5]
 

 . See id.
 

 [6]
 

 . 796 P.2d 1344 (Alaska 1990).
 

 [7]
 

 . 864 P.2d 538 (Alaska 1993).
 

 [8]
 

 . - Beard I, 796 P.2d at 1347.
 

 [9]
 

 . See id.
 

 [10]
 

 . See id. at 1348.
 

 [11]
 

 . Id. at 1350. Alaska's constructive discharge cause of action is consistent with federal policy. Federal courts unanimously recognize a constructive discharge claim that prevents employers from creating intolerable work environments designed to force employees to resign. - See id. at 1349-50 n. 5 (citing Sure-Tan, Inc. v. N.L.R.B., 467 U.S. 883, 894, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); Young v. Southwestern Sav. & Loan Ass'n, 509 F.2d 140, 144 (5th Cir.1975); N.L.R.B. v. Holly Bra of California, 405 F.2d 870, 872 (9th Cir.1969)); see also Watson v. Nationwide Ins. Co., 823 F.2d 360 (9th Cir.1987) (reversing grant of summary judgment to defendant in constructive discharge case stemming from Title VII discrimination claim); Nolan v. Cleland, 686 F.2d 806 (9th Cir.1982) (same).
 

 [12]
 

 . Beard II, 864 P.2d at 547 (internal citations omitted).
 

 [13]
 

 . Id. (citations omitted).
 

 [14]
 

 . See id. at 548.
 

 [15]
 

 . See Ramsey v. City of Sand Point, 936 P.2d 126, 129 (Alaska 1997).
 

 [16]
 

 . Jones v. Central Peninsula Gen. Hosp., 779 P.2d 783, 789 (Alaska 1989).
 

 [17]
 

 . 936 P.2d at 133.
 

 [18]
 

 . Id.
 

 [19]
 

 . Id. (citing Luedtke v. Nabors Alaska Drilling, Inc., 834 P.2d 1220, 1224 (Alaska 1992)). Similarly, an employer may breach the covenant by firing an employee in violation of public policy. See Luedtke v. Nabors Alaska Drilling, Inc., 768 P.2d 1123, 1130 (Alaska 1989).
 

 [20]
 

 . Finch stated in a deposition presented with Bob's memorandum in support of its motion for summary judgment that he responded to Thomson's letter by requesting clarification from Main concerning overtime procedures and was waiting for such clarification at that time.
 

 [21]
 

 . See Teamsters Local 959 v. Wells, 749 P.2d 349, 357 (Alaska 1988); see also Richardson v. Fairbanks N. Star Borough, 705 P.2d 454, 456 (Alaska 1985) (adopting the Restatement (Second) of Torts § 46(1) (1965) in defining a claim for IIED). The Restatement defines the tort of IIED: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."
 

 [22]
 

 . 705 P.2d at 456 (footnotes omitted); see also Nome Commercial Co. v. National Bank of Alaska, 948 P.2d 443, 453 (Alaska 1997).
 

 [23]
 

 . Restatement (Second) of Torts § 46(1) emt. d; see also Teamsters Local 959, 749 P.2d at 357 n. 13.
 

 [24]
 

 . See Restatement (Second) of Torts § 46(1) cmt. d.
 

 [25]
 

 . The release language in the settlement provides, in relevant part:
 

 6. General Release. As a material inducement to Defendant to enter into this Agreement, Plaintiff hereby irrevocably and unconditionally releases and discharges Defendant and each of its officers and employees for any and all claims set forth in plaintiffs [sic] complaint and amended complaint arising from his employment relationship with the Defendant to date, including, without limitation each and every claim referred to in Section 2 above with the sole exception of the [ERISA] payment claims in Section 2(D).
 

 [[Image here]]
 

 8. Allocation of Payments. The above payments totaling $120,000 represent payment for all of Plaintiff's alleged claims and causes of action (except for the [ERISA] payment claims referenced in Section 2(D) above).
 

 [26]
 

 . See Larsen v. Municipality of Anchorage, 993 P.2d 428, 431, 433 (Alaska 1999).
 

 [27]
 

 . Tolstrup v. Miller, 726 P.2d 1304, 1306 (Alaska 1986) (quoting Restatement (Second) of Judgments § 24 (1982)) (citations omitted).
 

 [28]
 

 . 936 P.2d 163 (Alaska 1997).
 

 [29]
 

 . See id. at 165.
 

 [30]
 

 . See id.
 

 [31]
 

 . See id.
 

 [32]
 

 . See id.
 

 [33]
 

 . See id.
 

 [34]
 

 . See id.
 

 [35]
 

 . See id. at 167-68.
 

 [36]
 

 . Bob's cross-appealed on the superior court's denial of its request for attorney's fees and costs stemming from the preceding federal litigation. Our disposition of this case renders the attorney's fees and costs issue moot.