NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MELISSA HOPPE, | ) | |
| | ) | Supreme Court No. S-18881 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-18-11571 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF CORRECTIONS; WILLIAM | ) | |
| LAPINSKAS, in his individual capacity as | ) | No. 2107 – September 24, 2025 |
| Superintendent III, Alaska Department of | ) | |
| Corrections; and JAMES CASSELL, in | ) | |
| his individual capacity as Health | ) | |
| Practitioner II, Alaska Department of | ) | |
| Corrections, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, the Honorable Herman G. Walker, Jr., Judge.

Appearances: Isaac D. Zorea, Zorea Law, Anchorage, for Appellant. Brandon Smith, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, and Pate, Justices.

---

\*      Entered under Alaska Appellate Rule 214.

# I. INTRODUCTION

A physician assistant working at a state correctional facility resigned after about nine months of employment. Arguing that her resignation amounted to constructive discharge under Alaska's whistleblower statute, the physician assistant filed suit. Following a bench trial, the superior court concluded that the physician assistant was not constructively discharged and dismissed the whistleblower claim. The physician assistant argues on appeal that the superior court improperly applied the law and based its decision on erroneous factual findings. We disagree and affirm the judgment of the superior court.

# II. FACTS AND PROCEEDINGS

## A. Facts

Melissa Hoppe is a licensed physician assistant. Hoppe was employed by the Department of Corrections (DOC) at Spring Creek Correctional Center (SCCC) from July 17, 2017, until her resignation on April 6, 2018. Hoppe worked within the medical department and was supervised by a senior physician assistant, James Cassell, and the SCCC superintendent, William Lapinskas. Hoppe worked regularly with a supervisor in the nursing department, Lynn Lawrence. Although Hoppe and Lawrence worked in different departments with distinct chains of command, both employees were overseen by Laura Brooks, Deputy Director of Health & Rehabilitation Services.

In December 2017 Hoppe and Lawrence had a disagreement over how to handle paperwork regarding an inmate who needed to be placed on "suicide precautions." According to Hoppe, she "called the nursing department . . . [a]nd [she] asked Nurse Lawrence[] if she could please put in the suicide precaution paper," because Hoppe couldn't do so immediately. Lawrence "refused" and told Hoppe to "do it later," which Hoppe believed was "inappropriate." Hoppe characterized this incident as one of the "first big concerns" of her employment.

As friction between Hoppe and Lawrence continued, the two attended a meeting with their direct supervisors in January 2018 "to help [them] distinguish [their] roles." It was agreed that Hoppe should communicate with Lawrence primarily over email. Hoppe began sending emails to Lawrence a few days later. In her emails Hoppe detailed concerns specific to various patients, as well as those of a recurring, systemic nature such as information missing from health records, expired medication, and delays between patient requests and receipt of medical attention. Because Hoppe did not often receive substantive replies to these emails, she felt she "was not getting any communication back from the nurses."

By mid-January 2018, from DOC's perspective, Hoppe "was having communication problems with the staff, both the medical staff and . . . correctional officer staff," including "setting up programs and going outside the system." Cassell addressed these issues with Hoppe. Hoppe claimed that she was subsequently "contacted by Mr. Cassell, and [she] was told that [she] was no longer allowed to email any concerns to anyone" and, further, that she "was not allowed to speak to Nurse Lawrence," except in person and only regarding "patient health concerns . . . or nursing issues that [she] was having." Cassell noted that the communications restrictions stemmed from the fact that "it was perceived that [Hoppe] was causing trouble."

In February, Hoppe received a letter of expectations from Cassell. The letter noted various "performance expectations" that were "specifically developed . . . to assist [Hoppe] in meeting performance standards required . . . to be successful" in her position at SCCC. Cassell chose to address Hoppe's performance in an expectations letter in lieu of "punitive things like letters of counseling or letters of reprimand," because at the time he "had some expectation that it might be possible that [they] could get [Hoppe] to work within the system."

Shortly thereafter Hoppe sent another email to Lawrence listing a number of issues and copied Cassell and Lapinskas. This resulted in a back-and-forth email

exchange between Hoppe and Lawrence. Brooks, who was copied later in the email chain, wrote back to "ask [Hoppe] that [she] consider how [she] might better communicate with nursing staff." Brooks also suggested that "[a] simple conversation with [Lawrence] can go a long way toward improving the functioning of the clinic." Brooks asked that Hoppe "not send any more emails of this nature to nursing staff until there [had been] a chance to discuss things further."

In response, Hoppe denied that a conversation would be helpful and noted that she only began sending emails to Lawrence because she believed that was the desired outcome of the January meeting with their respective supervisors. Hoppe concluded by noting that she was "exhausted from asking for help when there continues to be no changes," and had "contacted several agencies and filed the necessary paperwork . . . to investigate [her] concerns." Lapinskas wrote separately to Brooks to say that "[a]n outside look at this situation [did] not intimidate [him], however the lack of ownership on [Hoppe's] part regarding her role in this [was] alarming."

Cassell met with Hoppe in March to discuss her mid-year evaluation. The evaluation recognized Hoppe as a qualified practitioner with the potential to excel, but also explained that her communication skills were lacking. For example, the evaluation noted that Hoppe "demonstrates an ability to apply evidence based medicine to make focused and appropriate clinical decisions," but that she "occasionally loses sight of her responsibilities vs. nursing managements [sic] supervisory responsibilities over nursing performance." The evaluation documented that Hoppe "continues to struggle with appropriately addressing her frustrations with other health care staff," and that her "inability to effectively communicate her concerns with nursing staff ha[d] resulted in tangible staff discord." The overall rating for Hoppe's performance was "low acceptable," her interpersonal rating relationships rating was "unacceptable," and goals for improvement included improving communication skills and attending conflict management training.

On April 6, shortly after receiving her evaluation, Hoppe resigned. Hoppe's resignation letter stated that she was leaving her position "due to the numerous serious nursing issues and patient concerns" that she had "addressed . . . with no resolve." She stated that she was being retaliated against for expressing her concerns, and no longer believed SCCC was a safe or healthy work environment.

**B.    Proceedings**

Hoppe filed suit, alleging two causes of action:  one for violations of the Alaska Whistleblower Act[1] and the other for First Amendment violations pursuant to 42 U.S.C. § 1983.  Following discovery, DOC moved for summary judgment on both claims.  The superior court granted summary judgment to DOC on Hoppe's First Amendment claim, dismissing that cause of action.[2]  However, it denied summary judgment as to Hoppe's whistleblower claim.  The court subsequently held a five-day bench trial at which Hoppe, Cassell, Lapinskas, and Brooks testified, as did DOC's Chief Medical Officer, a member of the DOC human resources team, and an expert on wage and compensation loss.

After trial the superior court issued a final judgment explaining that "Hoppe ha[d] not met her burden to show she was constructively discharged by her employer."  The court stated that "[a]lthough Ms. Hoppe is adamant that she resigned due to retaliation for communicating with outside agencies and concerns for her license . . . her termination was not motivated by those reasons."  Consequently, the court denied her whistleblower claim.

Hoppe appeals.

**III.    STANDARD OF REVIEW**

---

[1]    AS 39.90.100–.150.

[2]    Hoppe does not appeal the court's dismissal of her First Amendment claim; thus, we do not discuss it further.

"Whether the trial court applied the correct legal standard is a question of law that we review de novo."**[3]** We review findings of fact under the clearly erroneous standard.**[4]** We grant "particular deference to the superior court's credibility determinations."**[5]** "Where the trial court makes factual findings that . . . are supported by the record, we do not reweigh the conflicting evidence."**[6]** Consequently, the trial court's factual determinations should only be reversed as "clearly erroneous if we are left with a 'definite and firm conviction . . . that a mistake has been made.' "**[7]**

## IV.   DISCUSSION

Hoppe sued DOC for violations of the Alaska Whistleblower Act. "[T]o bring suit under the Whistleblower Act 'an employee must show that (1) she has engaged in a protected activity and (2) the activity was a "substantial" or "motivating" factor" in her termination.' "**[8]** However, Hoppe was not terminated from her position. Instead, she argues that she was forced to resign after she was retaliated against for

---

[3]     *Hunter v. Philip Morris USA Inc.*, 364 P.3d 439, 447 (Alaska 2015) (citing *Kava v. Am. Honda Motor Co.*, 48 P.3d 1170, 1173 (Alaska 2002)).

[4]     *Swalling Constr. Co. v. Alaska USA Ins. Brokers, LLC*, 558 P.3d 613, 617-18 (Alaska 2024) (citing *Riddle v. Lanser*, 421 P.3d 35, 44 (Alaska 2018)).

[5]     *Kenai Landing, Inc. v. Cook Inlet Nat. Gas Storage Alaska, LLC*, 441 P.3d 954, 963 n.32 (Alaska 2019) (alterations omitted) (quoting *Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co.*, 299 P.3d 148, 166 (Alaska 2012)).

[6]     *Pasley v. Pasley*, 442 P.3d 738, 752 (Alaska 2019) (citing *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 450-51 (Alaska 2017)).

[7]     *In re Est. of Kottke*, 6 P.3d 243, 245 (Alaska 2000) (quoting *Mathis v. Meyeres*, 574 P.2d 447, 449 (Alaska 1978)).

[8]     *State, Dep't. of Fam. & Cmty. Servs., Off. of Child.'s Servs. v. Lane*, 542 P.3d 1124, 1132 (Alaska 2024) (quoting *Okpik v. City of Barrow*, 230 P.3d 672, 678 (Alaska 2010)).

sharing her concerns, amounting to constructive discharge from her position.[9] "To prove constructive discharge, employees must show that reasonable persons in their position would have felt compelled to resign."[10]

On appeal, Hoppe first argues that the superior court erred as a matter of law by misapplying the standard for constructive discharge.[11] Second, she argues that the court clearly erred when it credited the testimony of Cassell and Brooks over her own testimony. We are not persuaded by either argument.

### A.  The Superior Court Properly Applied The Standard For Constructive Discharge.

Hoppe argues that the superior court improperly applied the legal standard for constructive discharge by considering facts from the perspective of a "reasonable employee." Hoppe maintains the court was required to consider whether a "reasonable person *in the employee's position*" would have had no choice but to resign. (Emphasis in original.) The impact of this nuance, Hoppe argues, is that the court "only looked at [her evidence] from the perspective of a reasonable employee, generically," when the court should have considered "how a reasonable physician assistant would view her working condition." In particular, she maintains that the court was required to consider her claim from the perspective of a physician assistant who "complained that her directives were being ignore[d] to the harm of her patients," and for whom "these complaints were known to management and ignored."

Hoppe's argument fails because the superior court expressly articulated the correct standard for constructive discharge. Further, the court did, in fact, consider

---

[9]  *Id.*; *see also City of Fairbanks v. Rice*, 20 P.3d 1097, 1102 (Alaska 2000).

[10]  *Lane*, 542 P.3d at 1132 (quoting *Rice*, 20 P.3d at 1102).

[11]  While a whistleblower claim under Alaska law contains multiple elements, Hoppe only challenges the analysis with respect to constructive discharge.

the whistleblower claim from the perspective of a physician assistant in Hoppe's particular employment circumstances.

Hoppe cites *Cameron v. Beard* in support of her assertion that "the correct legal standard . . . [should have been] from the perspective of whether a 'reasonable person *in the employee's position* would have felt compelled to resign.' "[12] But the court quoted this exact language when outlining the legal standard for constructive discharge. Indeed, the superior court's order cited to *Beard* for this very purpose. It is true that later in the same order the court stated that "there must be facts that support no *reasonable employee* would have remained under the circumstances." (Emphasis added.) But there is nothing inaccurate about this slight reformulation of the standard, particularly given that the phrase "under the circumstances" effectively encapsulates the perspective of a reasonable physician assistant in Hoppe's position. And the court's express reliance on *Beard* further supports the conclusion that there was no legal error.

After summarizing the correct standard, the superior court then properly applied it to Hoppe's situation. Proper application of the constructive discharge standard is highly contextual. In some cases, the court might be required to narrow in on the particular circumstances of an employee's situation, focusing on considerations that are unique to that employee's position.[13] In other cases, though, it may be appropriate for the court to take a more general perspective.[14]

---

[12] 864 P.2d 538, 547 (Alaska 1993) (emphasis added).

[13] *See Finch v. Greatland Foods, Inc.*, 21 P.3d 1282, 1286 (Alaska 2001) (relying in part on evidence — unique to delivery drivers — that "route switch with a junior driver was a humiliating demotion" sufficient, in conjunction with other factors, to compel senior driver's resignation).

[14] *See Beard*, 864 P.2d at 548 (upholding finding that employee was constructively discharged after considering evidence such as sudden negative performance evaluations and fact that supervisor was asked "to 'do a hatchet job' on [employee]").

In this case the superior court appropriately focused on circumstances that were unique to Hoppe's position. The court noted that Hoppe felt she had no choice but to resign "due to a culmination of retaliation and fear she would lose her license," the latter concern being one of specific importance to licensed medical practitioners like physician assistants. It also noted that Hoppe resigned because she perceived "continued negligence by SCCC nurses" and the "realization that none of her supervisory staff were willing to work toward resolving the nursing problems she observed." Again, these observations are not generic; they relate to medical licensure, a more individualized employment consideration. Indeed, Hoppe herself acknowledges that "the superior court did assess [her] perspective" in this regard. Contrary to Hoppe's assertion, it is clear that the court took into consideration that a physician assistant in Hoppe's circumstances had obligations different from those of a generic "reasonable employee."

With regard to the analysis incorporating these considerations, our case law provides clear guidance: the analysis is an objective one. In *Finch v. Greatland Foods, Inc.*, "[w]e elected to define a viable constructive discharge claim[] by reference to an objective standard."[15] This standard requires an employee "to offer evidence that might lead a reasonable person to find the working conditions . . . so intolerable as to cause a reasonable person to resign."[16] And, in *Pitka v. Interior Regional Housing Authority*, we affirmed summary judgment against a former employee and stated that her fears about being fired or demoted, though likely genuine, were nonetheless "subjective beliefs [that] were not relevant" to the analysis.[17] Because the former employee's fears in *Pitka* were "products of her own assumptions," we held that,

---

[15]    21 P.3d at 1285.

[16]    *Id.*

[17]    54 P.3d 785, 790 (Alaska 2002).

standing alone, such fears were "legally insufficient to establish a claim for wrongful discharge."[18]

Here, Hoppe's constructive discharge claim relies heavily on fears that were products of her own assumptions. The superior court recognized that "Hoppe believed she reported on sub-standard care . . . [but was] wholly ignored by her superiors," that "if corrective action was not taken, it would jeopardize her career," and that various other complaints she raised "*do* align with [her] remarks and eventual resignation." (Emphasis in original.) Prior to her resignation Hoppe emailed Cassell asking him whether she should continue to document concerns that "still are not currently being fixed." And in her testimony Brooks could not definitively say that Hoppe had been informed, prior to her resignation, that there were investigations into her concerns. Hoppe herself testified that "no one had ever told [her] . . . anything — they never looked into any claim. [She] was never told that they did." Further, Hoppe was genuinely concerned about the issues she reported; in one email, she noted that the situation is "frustrating," and that she "love[s] prison medicine and want[s] to do what is right for the patients."

But even assuming that Hoppe was not timely informed that there were investigations into her claims, and that as a result she genuinely felt compelled to resign, her claim for constructive discharge still fails. This is because Hoppe failed to show that any reasonable employee facing the same circumstances in her position would have felt compelled to resign. This conclusion is supported by the superior court's findings that Hoppe's complaints against DOC were investigated, unsubstantiated and not credible, and that there was no evidence that her supervisors made any effort to stifle the substance of her complaints. Accordingly, we hold that the superior court properly stated and applied the standard for constructive discharge.

---

[18] *Id.*

**B.      The Superior Court's Findings Of Fact Were Not Clearly Erroneous.**

Hoppe also challenges two factual findings on appeal.  First, she argues that given "the objective evidence she offered at trial," it was "impossible to conclude that the DOC's problem with [her] dealt with her ability to communicate rather than the content of her communications."  And second, she argues that the superior court incorrectly "believed the testimony that . . . [her] complaints were proven to be unsubstantiated."  These arguments are not persuasive because we are not left with a definite and firm conviction that the superior court's factual findings were erroneous.

**1.      The superior court did not clearly err by finding that DOC's primary concern was with Hoppe's ability to communicate.**

In support of her first challenge, Hoppe points to an email that she sent to Brooks "identif[ying] the fact that she had observed critical patient care issues and that Nurse Lawrence had not addressed the concerns."  She argues it was "significant" that Brooks never replied because "[i]f Brooks had a problem with [her] communication . . . Brook[s] had an opportunity to respond to these concerns but did not."  But Brooks, a deputy director for DOC responsible for a 250-person department, may not have replied for any number of reasons, including the sheer volume of mail she has to contend with.  Indeed, Brooks testified that she "can't [reply to every email]," and explained that she goes "back to the direct supervisors through that chain of command and ensure[s] that they are doing what they need to do to support those staff."  Consequently, the superior court had testimony from which it could reasonably conclude that Brooks's lack of response was not necessarily implicit approval of the substance of Hoppe's communications.

Next, Hoppe implies that because she received positive feedback on some of her emails, DOC could not have truly been concerned with her communication style.  In support, she points to two emails:  One is from Lapinskas, in which he "did not admonish [her] for sending emails, but instead thanked her for the email"; the other is from DOC's chief medical officer which supposedly "praised [her] for being observant

concerning patient care."  Hoppe does not explicitly spell out how these emails discredit the finding that DOC took issue with her communication style rather than the substance of her communications.  However, Hoppe appears to argue that, because she received some positive feedback following her January meeting with Lawrence and supervisors, she had either resolved or was on track to resolve any communication problems that existed at that time.

Even if both emails could be read as unqualified praise for some of Hoppe's communications, the court still had plenty of evidence to support its finding that "the underlying issue was with Ms. Hoppe's *ability* to communicate, not the contents of her communication."  (Emphasis in original.) For instance, Hoppe's mid-year review stated that she "struggle[d] with appropriately addressing her frustrations" and that her "inability to effectively communicate her concerns with nursing staff ha[d] resulted in tangible staff discord."  Brooks testified that "every other person who evaluated or worked at Spring Creek saw there to be one issue, and that was Ms. Hoppe's communication style."  Finally, to the extent Hoppe challenges the trial court's decision to credit DOC testimony over her own testimony in regards to her communication style, we reject the challenge in light of the significant deference we give to a trial court's credibility determinations.[19]

### 2. The superior court did not clearly err by crediting testimony that Hoppe's concerns were unsubstantiated.

Finally, Hoppe contends that the superior court incorrectly "believed the testimony [from Cassell and Brooks] that . . . [her] complaints were proven to be unsubstantiated."  Hoppe appears to suggest that we should reverse the court's

---

[19]     *Kenai Landing, Inc. v. Cook Inlet Nat. Gas Storage Alaska, LLC*, 441 P.3d 954, 963 n.32 (Alaska 2019).

credibility determinations, but we decline to do so.[20] We similarly reject a more charitable reading of Hoppe's argument: that the lower court clearly erred by finding that her complaints were unsubstantiated. Even in that light, her argument is not persuasive; the record supports the superior court's finding. Cassell testified that he was not "able to substantiate what [Hoppe] was complaining about." Hoppe claimed that medications had not been timely provided to inmates, but Cassell noted that all medications were marked as having been given at the appropriate time. Cassell explained that there was no evidence to support Hoppe's concerns because "the system [does] not allow you to backdate." And apart from Hoppe's own testimony and the allegations she made in emails, Hoppe provided no evidence to otherwise substantiate her complaints.

Relatedly, Hoppe argues that even though "Cassell testified at trial that Ms. Hoppe's concerns were unfounded, the investigations only occurred after she had resigned." Hoppe presents no evidence to support this claim. In fact, the record suggests investigations did occur during Hoppe's employment. Cassell testified that "staff reviewed some of the concerns that [Hoppe] raised" but "found . . . no negligence [or] malpractice." So, "in February or March" — months before Hoppe resigned — he "asked one of [the] physicians to go down monthly . . . to assist Ms. Hoppe with learning the process and . . . protocols for correctional medicine." Moreover, in response to the concerns Hoppe raised, Brooks asked another DOC doctor "to go down weekly to Spring Creek to offer more support to Ms. Hoppe" and "help her communicate and help her learn correctional medicine and recognize that perhaps many

---

[20] *Hussein-Scott v. Scott*, 298 P.3d 179, 182 (Alaska 2013) ("[A]ssessment of witness credibility is the exclusive province of the fact-finder, and we will not revisit that assessment on appeal."); *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001) (noting that it "is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence" (quoting *Knutson v. Knutson*, 973 P.2d 596, 599–600 (Alaska 1999))).

of the issues that she thought were issues with nursing were . . . not what she thought they were."

Consequently, there was sufficient evidence to support the finding that DOC conducted an investigation of some sort during the period of Hoppe's employment. Although it is less clear whether the existence or outcome of an investigation was communicated to Hoppe prior to her resignation, that fact is not relevant to the superior court's decision because Hoppe did not establish that a reasonable employee in her position would have resigned due to the alleged lack of transparency. In light of the evidence supporting the superior court's findings, as well as the deference we give to credibility determinations made by the trial court, it was not clearly erroneous for the court to credit the narrative provided by DOC over that provided by Hoppe.[21]

## V. CONCLUSION

We AFFIRM the judgment of the superior court.

---

[21] Credibility determinations will not be reversed on appeal unless clearly erroneous. *In re Est. of Rodman*, 498 P.3d 1054, 1066 (Alaska 2021).